UNITED STATES DEPARTMENT OF ENERGY *v.*
OHIO ET AL.

No. 90–1341.   Argued December 3, 1991—Decided April 21, 1992*

---

*Together with No. 90–1517, *Ohio et al.* v. *United States Department of
Energy*, also on certiorari to the same court.

608

SOUTER, J., delivered the opinion for a unanimous Court with respect to Part II–C, and the opinion of the Court with respect to Parts I, II–A, II–B, and III, in which REHNQUIST, C. J., and O'CONNOR, SCALIA, KENNEDY, and THOMAS, JJ., joined. WHITE, J., filed an opinion concurring in

part and dissenting in part, in which BLACKMUN and STEVENS, JJ., joined, *post*, p. 629.

*James A. Feldman* argued the cause for petitioner in No. 90–1341 and respondent in No. 90–1517. With him on the briefs were *Solicitor General Starr, Acting Assistant Attorney General Hartman, Deputy Solicitor General Wallace, Robert L. Klarquist,* and *Jacques B. Gelin.*

*Jack A. Van Kley,* Assistant Attorney General of Ohio, argued the cause for respondents in No. 90–1341 and petitioners in No. 90–1517. With him on the brief were *Lee Fisher,* Attorney General, and *Timothy J. Kern* and *Terrence S. Finn,* Assistant Attorneys General.†

---

†Briefs of *amici curiae* were filed for the State of California et al. by *Gale A. Norton,* Attorney General of Colorado, *Raymond T. Slaughter,* Chief Deputy Attorney General, *Timothy M. Tymkovich,* Solicitor General, *Martha E. Rudolph, Cynthia M. Vagelos,* and *Mary Capdeville,* Assistant Attorneys General, *Daniel E. Lungren,* Attorney General of California, *Roderick E. Walston,* Chief Assistant Attorney General, *Theodora Berger* and *R. H. Connett,* Senior Assistant Attorneys General, *Edwin F. Lowry,* Deputy Attorney General, *Charles E. Cole,* Attorney General of Alaska, *Grant Woods,* Attorney General of Arizona, *Paige Murphy-Young,* Assistant Attorney General, *Winston Bryant,* Attorney General of Arkansas, *Richard Blumenthal,* Attorney General of Connecticut, *Warren Price III,* Attorney General of Hawaii, *Larry EchoHawk,* Attorney General of Idaho, *Roland W. Burris,* Attorney General of Illinois, *Linley E. Pearson,* Attorney General of Indiana, *Bonnie J. Campbell,* Attorney General of Iowa, *Frederic J. Cowan,* Attorney General of Kentucky, *Michael E. Carpenter,* Attorney General of Maine, *Dennis J. Harnish,* Assistant Attorney General, *J. Joseph Curran, Jr.,* Attorney General of Maryland, *Frank J. Kelley,* Attorney General of Michigan, *Hubert H. Humphrey III,* Attorney General of Minnesota, *William L. Webster,* Attorney General of Missouri, *Marc Racicot,* Attorney General of Montana, *Frankie Sue Del Papa,* Attorney General of Nevada, *Robert J. Del Tufo,* Attorney General of New Jersey, *Tom Udall,* Attorney General of New Mexico, *Lacy H. Thornburg,* Attorney General of North Carolina, *Nicholas J. Spaeth,.* Attorney General of North Dakota, *T. Travis Medlock,* Attorney General of South Carolina, *Charles W. Burson,* Attorney General of Tennessee, *Michael D. Pearigen,* Deputy Attorney General, *Dan Morales,* Attorney General of Texas, *Thomas Edwards,* Assistant Attorney General, *Paul Van Dam,* Attorney

JUSTICE SOUTER delivered the opinion of the Court.

The question in these cases is whether Congress has waived the National Government's sovereign immunity from liability for civil fines imposed by a State for past violations of the Clean Water Act (CWA), 86 Stat. 816, as amended, 33 U. S. C. § 1251 *et seq.*, or the Resource Conservation and Recovery Act of 1976 (RCRA), 90 Stat. 2796, as amended, 42 U. S. C. § 6901 *et seq.* We hold it has not done so in either instance.

I

The CWA prohibits the discharge of pollutants into navigable waters without a permit. Section 402, codified at 33 U. S. C. § 1342, gives primary authority to issue such permits to the United States Environmental Protection Agency (EPA), but allows EPA to authorize a State to supplant the federal permit program with one of its own, if the state scheme would include, among other features, sufficiently stringent regulatory standards and adequate provisions for penalties to enforce them. See generally 33 U. S. C. § 1342(b) (requirements and procedures for EPA approval of state water-pollution permit plans); see also 40 CFR §§ 123.1–123.64 (1991) (detailed requirements for state plans). RCRA regulates the disposal of hazardous waste in much the same way, with a permit program run by EPA but subject to displacement by an adequate state counterpart. See generally 42 U. S. C. § 6926 (requirements and procedures for EPA

General of Utah, *Denise Chancellor*, Assistant Attorney General, *Jeffrey L. Amestoy*, Attorney General of Vermont, *Mary Sue Terry*, Attorney General of Virginia, *Patrick O'Hare*, Senior Assistant Attorney General, *Kenneth O. Eikenberry*, Attorney General of Washington, *James K. Pharris*, Senior Assistant Attorney General, and *Jay J. Manning*, Assistant Attorney General; for the Natural Resources Defense Council by *Philip F. W. Ahrens III*; and for the National Governors' Association et al. by *Richard Ruda, Donald B. Verrilli, Jr.*, and *Barry Levenstam.*

approval of state hazardous-waste disposal permit plans); see also 40 CFR §§ 271.1–271.138 (1991) (detailed requirements for state plans).

This litigation began in 1986 when respondent State of Ohio sued petitioner Department of Energy (DOE) in Federal District Court for violations of state and federal pollution laws, including the CWA and RCRA, in operating its uranium-processing plant in Fernald, Ohio. Ohio sought, among other forms of relief, both state and federal civil penalties for past violations of the CWA and RCRA and of state laws enacted to supplant those federal statutes. See, e. g., Complaint ¶ 64 (seeking penalties for violations of state law and of regulations issued pursuant to RCRA); id., ¶ 115 (seeking penalties for violations of state law and of CWA).[1] Before the District Court ruled on DOE's motion for dismissal, the parties proposed a consent decree to settle all but one substantive claim,[2] and Ohio withdrew all outstanding claims for relief except its request for civil penalties for DOE's alleged past violations. See Consent Decree Between DOE and Ohio, App. 63. By a contemporaneous stipulation, DOE and Ohio agreed on the amount of civil penalties DOE will owe if it is found liable for them, see Stipulation Between DOE and Ohio, id., at 87. The parties thus left for determination under the motion to dismiss only the issue we consider today: whether Congress has waived the National Government's sovereign immunity from liability for civil fines imposed for past failure to comply

---

[1] Federal- and state-law fines differ both as to their amounts and the sovereign that gets them, state-law fines going to the State, and federal-law fines going to the federal treasury. Ohio's state-law fines are currently lower than their federal-law counterparts. See generally Tr. of Oral Arg. 36–37, 49–52; see also Brief for Respondent Ohio 36. The parties have agreed that if DOE is liable for both federal- and state-law fines it will be assessed only for the latter. See Stipulation Between DOE and Ohio, ¶¶ 2.1, 3.1, App. 87, 89, 90.

[2] The parties agreed to stay one claim pending completion of a technical study. See Stipulation Between DOE and Ohio, App. 87–88.

with the CWA, RCRA, or state law supplanting the federal regulation.

DOE admits that the CWA and RCRA obligate a federal polluter, like any other, to obtain permits from EPA or the state permitting agency, see Brief for Petitioner DOE 24 (discussing CWA); *id.*, at 34–40 (discussing RCRA).[3] DOE also concedes that the CWA and RCRA render federal agencies liable for fines imposed to induce them to comply with injunctions or other judicial orders designed to modify behavior prospectively, which we will speak of hereafter as "coercive fines." See *id.*, at 19–20, and n. 10; see also n. 14, *infra.* The parties disagree only on whether the CWA and RCRA, in either their "federal-facilities"[4] or "citizen-suit"[5] sections, waive federal sovereign immunity from liability for fines,

---

[3] DOE's water-pollution permit was issued by EPA. See Complaint ¶ 29. DOE had no RCRA permit at the time Ohio commenced this suit, despite RCRA's requirement that facilities such as DOE's Fernald plant obtain one. See Complaint ¶¶ 50, 52, 57; Answer of Federal Defendants ¶ 57.

[4] 33 U. S. C. § 1323(a) (CWA); 42 U. S. C. § 6961 (RCRA). The federal-facilities sections of the CWA and RCRA govern the extent to which federally operated facilities, such as DOE's Fernald facility, are subject to the requirements, including fines, of both their respective statutes and EPA-approved, state-law regulation and enforcement programs.

[5] 33 U. S. C. § 1365(a) (CWA); 42 U. S. C. § 6972(a) (RCRA). The citizen-suit sections of the CWA and RCRA authorize private enforcement of the provisions of their respective statutes. Unlike the waivers in the federal-facilities sections, which set forth the scope of federal sovereign immunity from the requirements, including fines, of both their respective statutes and EPA-approved, state-law regulation and enforcement programs, the citizen-suit sections, to the extent they waive federal immunity at all, waive such immunity only from federal-law penalties.

States may sue the United States under the citizen-suit sections. See 33 U. S. C. § 1365(a) (any "citizen" may bring citizen suit under CWA); *id.*, § 1365(g) (defining "citizen" for purposes of CWA citizen-suit section as "person . . . having an interest which is or may be adversely affected"); *id.*, § 1362(5) (defining "person" for purposes of CWA to include a State); 42 U. S. C. § 6972 ("any person" may bring citizen suit under RCRA); *id.*, § 6903(15) ("person" for purposes of RCRA includes a State).

which we will refer to as "punitive," imposed to punish past violations of those statutes or state laws supplanting them.

The United States District Court for the Southern District of Ohio held that both statutes waived federal sovereign immunity from punitive fines, by both their federal-facilities and citizen-suit sections. 689 F. Supp. 760 (1988). A divided panel of the United States Court of Appeals for the Sixth Circuit affirmed in part, holding that Congress had waived immunity from punitive fines in the CWA's federal-facilities section and RCRA's citizen-suit section, but not in RCRA's federal-facilities section. 904 F. 2d 1058 (1990).[6] Judge Guy dissented, concluding that neither the CWA's federal-facilities section nor RCRA's citizen-suit section sufficed to provide the waiver at issue. *Id.*, at 1065–1069.

In No. 90–1341, DOE petitioned for review insofar as the Sixth Circuit found any waiver of immunity from punitive fines, while in No. 90–1517, Ohio cross-petitioned on the holding that RCRA's federal-facilities section failed to effect such a waiver.[7] We consolidated the two petitions and granted certiorari, 500 U. S. 951 (1991).[8]

---

[6] The court held that its ruling on the CWA's federal-facilities section obviated any need to consider that statute's citizen-suit section. 904 F. 2d, at 1062.

[7] Ohio's petition also asked that if we reversed the lower court's conclusion on the CWA's federal-facilities section, we consider whether that statute's citizen-suit section contained a waiver, an issue the Sixth Circuit declined to reach.

[8] The Sixth Circuit's holding that the CWA's federal-facilities section waives federal sovereign immunity from punitive fines conflicts with the Ninth Circuit's conclusion that that section does not constitute such a waiver. See *California* v. *Department of Navy*, 845 F. 2d 222 (1988). One Court of Appeals has found such a waiver in the CWA's citizen-suit section. See *Sierra Club* v. *Lujan*, 931 F. 2d 1421 (CA10 1991). Two other Courts of Appeals agree with the Sixth Circuit that RCRA's federal-facilities section does not waive federal sovereign immunity from punitive fines. See *Mitzelfelt* v. *Department of Air Force*, 903 F. 2d 1293 (CA10 1990); *United States* v. *Washington*, 872 F. 2d 874 (CA9 1989). No other

## II

We start with a common rule, with which we presume congressional familiarity, see *McNary* v. *Haitian Refugee Center, Inc.*, 498 U. S. 479, 496 (1991), that any waiver of the National Government's sovereign immunity must be unequivocal, see *United States* v. *Mitchell*, 445 U. S. 535, 538–539 (1980). "Waivers of immunity must be 'construed strictly in favor of the sovereign,' *McMahon* v. *United States*, 342 U. S. 25, 27 (1951), and not 'enlarge[d] . . . beyond what the language requires.' *Eastern Transportation Co.* v. *United States*, 272 U. S. 675, 686 (1927)." *Ruckelshaus* v. *Sierra Club*, 463 U. S. 680, 685–686 (1983). By these lights we examine first the two statutes' citizen-suit sections, which can be treated together because their relevant provisions are similar, then the CWA's federal-facilities section, and, finally, the corresponding section of RCRA.

### A

So far as it concerns us, the CWA's citizen-suit section reads that

> "any citizen may commence a civil action on his own behalf—
>
> "(1) against any person (including . . . the United States . . .) who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation . . . .
>
> .    .    .    .    .
>
> "The district courts shall have jurisdiction . . . to enforce such an effluent standard or limitation, or such an order . . . as the case may be, and to apply any appro-

Court of Appeals appears to have considered whether RCRA's citizen-suit section constitutes such a waiver.

priate civil penalties under [33 U. S. C. § 1319(d)]." 33 U. S. C. § 1365(a).

The relevant part of the corresponding section of RCRA is similar:

"[A]ny person may commence a civil action on his own behalf —

"(1)(A) against any person (including . . . the United States) . . . who is alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to this chapter . . .

"(B) against any person, including the United States . . . who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment . . . .

. . . . .

". . . The district court shall have jurisdiction . . . to enforce the permit, standard, regulation, condition, requirement, prohibition, or order, referred to in paragraph (1)(A), to restrain any person who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste referred to in paragraph (1)(B), to order such person to take such other action as may be necessary, or both, . . . and to apply any appropriate civil penalties under [42 U. S. C. §§ 6928(a) and (g)]." 42 U. S. C. § 6972(a).

A State is a "citizen" under the CWA and a "person" under RCRA,[9] and is thus entitled to sue under these provisions.

Ohio and its *amici* argue that by specifying the United States as an entity subject to suit and incorporating the civil-

---

[9] See n. 5, *supra.*

penalties sections of the CWA and RCRA into their respective citizen-suit sections, "Congress could not avoid noticing that its literal language subject[ed] federal entities to penalties." Brief for Respondent Ohio 36; see also, *e. g.*, Brief for National Governors' Association et al. as *Amici Curiae* 14–16. It is undisputed that each civil-penalties provision authorizes fines of the punitive sort.

The effect of incorporating each statute's civil-penalties section into its respective citizen-suit section is not, however, as clear as Ohio claims. The incorporations must be read as encompassing all the terms of the penalty provisions, including their limitations, see, *e. g.*, *Engel* v. *Davenport*, 271 U. S. 33, 38 (1926) (adoption of earlier statute by reference "makes it as much a part of the later act as though it had been incorporated at full length"); see also 2B N. Singer, Sutherland on Statutory Construction § 51.08 (5th rev. ed. 1992), and significant limitations for present purposes result from restricting the applicability of the civil-penalties sections to "person[s]."[10] While both the CWA and RCRA define "person" to cover States, subdivisions of States, municipalities, and interstate bodies (and RCRA even extends the term to cover governmental corporations),[11] neither statute defines "person" to include the United States.[12] Its omission has to be

---

[10] See 33 U. S. C. § 1319(d) (CWA civil-penalties section); 42 U. S. C. §§ 6928(a), (g) (RCRA civil-penalties sections).

[11] See 33 U. S. C. § 1362(5) (defining "person" for purposes of CWA as "an individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a State, or any interstate body"); 42 U. S. C. § 6903(15) (defining "person" for purposes of RCRA as "an individual, trust, firm, joint stock company, corporation (including a government corporation), partnership, association, State, municipality, commission, political subdivision of a State, or any interstate body").

[12] A subsection of RCRA dealing with a federal demonstration program tracking the disposal of medical waste does in fact require that "each department, agency, and instrumentality of the United States" "be treated as" a "person." See Medical Waste Tracking Act of 1988, § 2(a), Pub. L. 100–582, 102 Stat. 2955, 42 U. S. C. § 6992e(b). This broader provision,

seen as a pointed one when so many other governmental entities are specified, see 2A Singer, *supra*, §47.23, a fact that renders the civil-penalties sections inapplicable to the United States.

Against this reasoning, Ohio argues that the incorporated penalty provisions' exclusion of the United States is overridden by the National Government's express inclusion as a "person" by each of the citizen-suit sections. There is, of course, a plausibility to the argument. Whether that plausibility suffices for the clarity required to waive sovereign immunity is, nonetheless, an issue we need not decide, for the force of Ohio's argument wanes when we look beyond the citizen-suit sections to the full texts of the respective statutes.

What we find elsewhere in each statute are various provisions specially defining "person" and doing so expressly for purposes of the entire section in which the term occurs. Thus, for example, "[f]or the purpose of this [CWA] section," 33 U. S. C. §1321(a)(7) defines "person" in such a way as to exclude the various governmental entities included in the general definition of "person" in 33 U. S. C. §1362(5).[13] Again, "[f]or the purpose of this section," §1322(a)(8) defines "person" so as to exclude "an individual on board a public vessel" as well as the governmental entities falling within the general definition. Similarly in RCRA, "[f]or the purpose of . . . subchapter [IX]" the general definition of "person" is expanded to include "the United States Government," among other entities. 42 U. S. C. §6991(6). Within each statute, then, there is a contrast between drafting that merely redefines "person" when it occurs within a particular clause or sentence and drafting that expressly alters the definition for any and all purposes of the entire section in

---

however, applies only "[f]or purposes of this Act," *ibid.*, which refers to the Medical Waste Tracking Act of 1988 itself, see 102 Stat. 2950.

[13] See n. 11, *supra*.

which the special definition occurs.[14]  Such differences in treatment within a given statutory text are reasonably understood to reflect differences in meaning intended, see 2A Singer, *supra*, § 46.06, and the inference can only be that a special definition not described as being for purposes of the "section" or "subchapter" in which it occurs was intended to have the more limited application to its own clause or sentence alone.  Thus, in the instances before us here, the inclusion of the United States as a "person" must go to the clauses subjecting the United States to suit, but no further.

This textual analysis passes the test of giving effect to all the language of the citizen-suit sections.  Those sections' incorporations of their respective statutes' civil-penalties sections will have the effect of authorizing punitive fines when a polluter other than the United States is brought to court by a citizen, while the sections' explicit authorizations for suits against the United States will likewise be effective, since those sections concededly authorize coercive sanctions against the National Government.[15]

A clear and unequivocal waiver of anything more cannot be found; a broader waiver may not be inferred, see *Ruckels-*

---

[14] The dissent fails to appreciate this difference, arguing that § 1365(a) "states that any person, as used in that subdivision, includes the United States," *post*, at 633.  That statement is simply incorrect; the citizen-suit section does no more than include the United States in the class of entities that may be the subject of a suit brought under this section.  In stark contrast to the examples we have given, see n. 12, *supra*, § 1365(a) does not purport to apply the more expansive definition of "person" throughout the subsection; by its terms it speaks only to the first mention of "person."

[15] DOE explicitly concedes that such relief is available against the United States in the context of citizen suits pursuant to the CWA, see Brief for Petitioner DOE 33, and implicitly so concedes with regard to RCRA, see *id.*, at 40–41.  DOE also concedes that both statutes' federal-facilities sections authorize imposition of injunctive-type relief against the National Government, see *id.*, at 19–20, and n. 10; see also *id.*, at 35.  DOE concedes federal liability to such penalties without reference to the civil-penalties sections of the CWA or RCRA.

*haus,* 463 U. S., at 685–686. Ohio's reading is therefore to be rejected. See *United States* v. *Nordic Village, Inc., ante,* at 37.

## B

The relevant portion of the CWA's federal-facilities section provides that

"[e]ach department, agency, or instrumentality of the . . . Federal Government . . . shall be subject to, and comply with, all Federal, State, interstate, and local requirements, administrative authority, and process and sanctions respecting the control and abatement of water pollution in the same manner . . . as any nongovernmental entity . . . . The preceding sentence shall apply (A) to any requirement whether substantive or procedural (including any recordkeeping or reporting requirement, any requirement respecting permits and any other requirement, whatsoever), (B) to the exercise of any Federal, State or local administrative authority, and (C) to any process and sanction, whether enforced in Federal, State, or local courts or in any other manner. . . . [T]he United States shall be liable only for those civil penalties arising under Federal law or imposed by a State or local court to enforce an order or the process of such court." 33 U. S. C. § 1323(a).

Ohio rests its argument for waiver as to punitive fines on two propositions: first, that the statute's use of the word "sanction" must be understood to encompass such fines, see Brief for Respondent Ohio 26–29; and, second, with respect to the fines authorized under a state permit program approved by EPA, that they "aris[e] under Federal law" despite their genesis in state statutes, and are thus within the scope of the "civil penalties" covered by the congressional waiver, *id.,* at 29–35.

1

Ohio's first proposition is mistaken. As a general matter, the meaning of "sanction" is spacious enough to cover not only what we have called punitive fines, but coercive ones as well, and use of the term carries no necessary implication that a reference to punitive fines is intended. One of the two dictionaries Ohio itself cites reflects this breadth. See Black's Law Dictionary 1341 (6th ed. 1990) (defining "sanction" as a "[p]enalty or other mechanism of enforcement used to provide incentives for obedience with the law or with rules and regulations. That part of a law which is designed to secure enforcement by imposing a penalty for its violation or offering a reward for its observance"). Ohio's other such source explicitly adopts the coercive sense of the term. See Ballentine's Law Dictionary 1137 (3d ed. 1969) (defining sanction in part as "[a] coercive measure").

Beyond the dictionaries, examples of usage in the coercive sense abound. See, e. g., *Penfield Co. of Cal.* v. *SEC*, 330 U. S. 585, 590 (1947) (fines and imprisonment imposed as "coercive sanctions" when imposed to compel target "to do what the law made it his duty to do"); *Hicks* v. *Feiock*, 485 U. S. 624, 633–634, n. 6 (1988) ("sanction" in *Penfield* was civil because it was conditional; contemnor could avoid "sanction" by agreeing to comply with discovery order); Fed. Rule Civ. Proc. 37(b) (describing as "sanctions" various steps district court may take in response to noncompliance with discovery orders, including holding recalcitrant deponent in contempt); *United States* v. *Westinghouse Elec. Corp.*, 648 F. 2d 642, 649 (CA9 1981) (discussing "sanctions," imposed pursuant to Fed. Rule Civ. Proc. 37(b), consisting of fine for each day litigant remained in noncompliance with District Court's discovery order); *Latrobe Steel Co.* v. *United Steelworkers of America, Local 1537*, 545 F. 2d 1336, 1344 (CA3 1976) ("Coercive sanctions . . . look to the future and are designed to aid the plaintiff by bringing a defiant party into compliance with the

court order or by assuring that a potentially contumacious party adheres to an injunction by setting forth in advance the penalties the court will impose if the party deviates from the path of obedience"); *Vincent* v. *Preiser*, 175 W. Va. 797, 803, 338 S. E. 2d 398, 403 (1985) (discussing contempt "sanctions" imposed "to compel compliance with a court order"); *Maltaman* v. *State Bar of Cal.*, 43 Cal. 3d 924, 936, 741 P. 2d 185, 189–190 (1987) (describing as "sanctions" daily fine imposed on party until it complied with order directing it to transfer certain property); *Labor Relations Comm'n* v. *Fall River Educators' Assn.*, 382 Mass. 465, 475–476, 416 N. E. 2d 1340, 1347 (1981) (affirming propriety of imposition of "coercive contempt sanction"); Cal. Civ. Proc. Code Ann. § 2023(b)(4) (West Supp. 1992) (authorizing, in response to litigant's failure to obey discovery order, "terminating sanction[s]," including "contempt sanction[s]" and orders staying further proceedings by recalcitrant litigant). Cf. 42 U. S. C. § 6992e(a) (waiving federal medical-waste disposal facilities' sovereign immunity from various requirements, including such "sanctions as may be imposed by a court to enforce [injunctive] relief"); *id.*, § 6961 (using same language to waive other federal facilities' immunity from RCRA provisions). Thus, resort to a "sanction" carries no necessary implication of the punitive as against the coercive.

The term's context, of course, may supply a clarity that the term lacks in isolation, see, *e. g.*, *Shell Oil Co.* v. *Iowa Dept. of Revenue*, 488 U. S. 19, 26 (1988). It tends to do so here, but once again the clarity so found cuts against Ohio's position. The word "sanction" appears twice in § 1323(a), each time within the phrase "process and sanction[s]." The first sentence subjects Government agencies to "process and sanctions," while the second explains that the Government's corresponding liability extends to "any process and sanction, whether enforced in Federal, State, or local courts or in any other manner."

Three features of this context are significant. The first is the separate statutory recognition of three manifestations of governmental power to which the United States is subjected: substantive and procedural requirements; administrative authority; and "process and sanctions," whether "enforced" in courts or otherwise. Substantive requirements are thus distinguished from judicial process, even though each might require the same conduct, as when a statute requires and a court orders a polluter to refrain from discharging without a permit. The second noteworthy feature is the conjunction of "sanction[s]" not with the substantive "requirements," but with "process," in each of the two instances in which "sanction" appears. "Process" normally refers to the procedure and mechanics of adjudication and the enforcement of decrees or orders that the adjudicatory process finally provides. The third feature to note is the statute's reference to "process and sanctions" as "enforced" in courts or otherwise. Whereas we commonly understand that "requirements" may be enforced either by backward-looking penalties for past violations or by the "process" of forward-looking orders enjoining future violations, such forward-looking orders themselves are characteristically given teeth by equity's traditional coercive sanctions for contempt: fines and bodily commitment imposed pending compliance or agreement to comply. The very fact, then, that the text speaks of sanctions in the context of enforcing "process" as distinct from substantive "requirements" is a good reason to infer that Congress was using "sanction" in its coercive sense, to the exclusion of punitive fines.

2

The last relevant passage of § 1323(a), which provides that "the United States shall be liable only for those civil penalties arising under Federal law or imposed by a State or local court to enforce an order or the process of such court," is not to the contrary. While this proviso is unlike the preceding

text in that it speaks of "civil penalties," not "sanctions," it is obviously phrased to clarify or limit the waiver preceding it. Here our concern is with its clarifying function (leaving its limiting effect until later), and it must be said that as a clarifier the proviso speaks with an uncertain voice. To be sure, the second modifier of "civil penalties" at least makes it plain that the term (like "sanction," to which it relates) must include a coercive penalty, since "civil penalties" are exemplified by those "imposed by a State or local court to enforce an order or the process of such court." To this extent, then, the proviso serves to confirm the reading we reached above.

The role of the first modifier is problematical, however. On the one hand, it tugs toward a more expansive reading of "civil penalties." If by using the phrase "civil penalties arising under Federal law" Congress meant nothing more than coercive fines arising under federal law, it would have been simpler to describe all such penalties as imposed to enforce an order or process, whether of a local, state, or federal court. Thus, the first modifier suggests that the civil penalties arising under federal law may indeed include the punitive along with the coercive. Nevertheless, a reading expansive enough to reflect a waiver as to punitive fines would raise a new and troublesome question about the source of legal authority to impose such a fine. As far as federal law is concerned, the only available source of authority to impose punitive fines is the civil-penalties section, § 1319(d). But, as we have already seen, that section does not authorize liability against the United States, since it applies only against "persons," from whom the United States is excluded.

Ohio urges us to find a source of authority good against the United States by reading "arising under Federal law" to include penalties prescribed by state statutes approved by EPA and supplanting the CWA. Ohio argues for treating a state statute as providing penalties "arising under Federal law" by stressing the complementary relationship between

the relevant state and federal statutes and the role of such state statutes in accomplishing the purpose of the CWA. This purpose, as Ohio states it, is "to encourage compliance with comprehensive, federally approved water pollution programs while shielding federal agencies from unauthorized penalties." Brief for Respondent Ohio 34–35. Ohio asserts that "federal facility compliance . . . cannot be . . . accomplished without the [punitive] penalty deterrent." *Id.*, at 35.

The case for such pessimism is not, however, self-evident. To be sure, an agency of the Government may break the law where it might have complied voluntarily if it had faced the prospect of punitive fines for past violations. But to say that its "compliance cannot be . . . accomplished" without such fines is to assume that without sanctions for past conduct a federal polluter can never be brought into future compliance, that an agency of the National Government would defy an injunction backed by coercive fines and even a threat of personal commitment. The position seems also to ignore the fact that once such fines start running they can be every dollar as onerous as their punitive counterparts; it could be a very expensive mistake to plan on ignoring the law indefinitely on the assumption that contumacy would be cheap.

Nor does the complementary relationship between state and federal law support Ohio's claim that state-law fines thereby "arise under Federal law." Plain language aside, the far more compelling interpretative case rests on the best known statutory use of the phrase "arising under federal law," appearing in the grant of federal-question jurisdiction to the courts of the United States. See 28 U. S. C. § 1331. There, we have read the phrase "arising under" federal law to exclude cases in which the plaintiff relies on state law, even when the State's exercise of power in the particular circumstances is expressly permitted by federal law. See, *e. g., Gully* v. *First Nat. Bank in Meridian,* 299 U. S. 109, 116 (1936) (suit over state taxation of nationally chartered bank does not arise under federal law even though such taxa-

tion would not be possible without federal approval); *International Bridge Co.* v. *New York*, 254 U. S. 126, 133 (1920) (congressional approval of construction of bridge by state-chartered company does not make federal law the source of right to build bridge).[16]   Congress' use of the same language in § 1323(a) indicates a likely adoption of our prior interpretation of that language.   See, *e. g., ICC* v. *Locomotive Engineers,* 482 U. S. 270, 284–285 (1987) (interpreting statute based on previous interpretation of same language in another statute); *Northcross* v. *Memphis Bd. of Education,* 412 U. S. 427, 428 (1973) *(per curiam)* (similarity of language in two statutes "strong indication that [they] should be interpreted *pari passu"*).   The probability is enough to answer Ohio's argument that "arising under Federal law" in § 1323(a) is broad enough to cover provisions of state statutes approved by a federal agency but nevertheless applicable *ex proprio vigore.*

Since Ohio's argument for treating state-penalty provisions as arising under federal law thus fails, our reading of the last-quoted sentence from § 1323(a) leaves us with an unanswered question and an unresolved tension between closely related statutory provisions.   The question is still what Congress could have meant in using a seemingly expansive phrase like "civil penalties arising under Federal law."   Perhaps it used it just in case some later amendment might waive the Government's immunity from punitive sanctions.   Perhaps a drafter mistakenly thought that liability for such sanctions had somehow been waived already.   Perhaps

---

[16] Of course, the phrase "arising under" federal law appears in Article III, § 2, of the Constitution, where it has received a broader construction than in its statutory counterpart.   See *Verlinden B. V.* v. *Central Bank of Nigeria,* 461 U. S. 480, 494–495 (1983).   Ohio, however, has offered no reason to believe Congress intended this broader reading rather than the narrower statutory reading.   Even assuming an equal likelihood for each intent, our rule requiring a narrow construction of waiver language tips the balance in favor of the narrow reading.

someone was careless. The question has no satisfactory answer.

We do, however, have a response satisfactory for sovereign immunity purposes to the tension between a proviso suggesting an apparently expansive but uncertain waiver and its antecedent text that evinces a narrower waiver with greater clarity. For under our rules that tension is resolved by the requirement that any statement of waiver be unequivocal: as against the clear waiver for coercive fines the indication of a waiver as to those that are punitive is less certain. The rule of narrow construction therefore takes the waiver no further than the coercive variety.

## C

We consider, finally, the federal-facilities section of RCRA, which provides, in relevant part, that the National Government

> "shall be subject to, and comply with, all Federal, State, interstate, and local requirements, both substantive and procedural (including any requirement for permits or reporting or any provisions for injunctive relief and such sanctions as may be imposed by a court to enforce such relief) . . . in the same manner, and to the same extent, as any person is subject to such requirements . . . . Neither the United States, nor any agent, employee, or officer thereof, shall be immune or exempt from any process or sanction of any State or Federal Court with respect to the enforcement of any such injunctive relief." 42 U. S. C. § 6961.

Ohio and its *amici* stress the statutory subjection of federal facilities to "all . . . requirements," which they would have us read as an explicit and unambiguous waiver of federal sovereign immunity from punitive fines. We, however, agree with the Tenth Circuit that "all . . . requirements" "can reasonably be interpreted as including substantive standards and the means for implementing those standards, but exclud-

ing punitive measures." *Mitzelfelt* v. *Department of Air Force*, 903 F. 2d 1293, 1295 (1990).

We have already observed that substantive requirements can be enforced either punitively or coercively, and the Tenth Circuit's understanding that Congress intended the latter finds strong support in the textual indications of the kinds of requirements meant to bind the Government. Significantly, all of them refer either to mechanisms requiring review for substantive compliance (permit and reporting requirements) or to mechanisms for enforcing substantive compliance in the future (injunctive relief and sanctions to enforce it). In stark contrast, the statute makes no mention of any mechanism for penalizing past violations, and this absence of any example of punitive fines is powerful evidence that Congress had no intent to subject the United States to an enforcement mechanism that could deplete the federal fisc regardless of a responsible officer's willingness and capacity to comply in the future.

The drafters' silence on the subject of punitive sanctions becomes virtually audible after one reads the provision's final sentence, waiving immunity "from any process or sanction of any State or Federal Court with respect to the enforcement of any such injunctive relief." The fact that the drafters' only specific reference to an enforcement mechanism described "sanction" as a coercive means of injunctive enforcement bars any inference that a waiver of immunity from "requirements" somehow unquestionably extends to punitive fines that are never so much as mentioned.[17]

---

[17] We also reject Ohio's argument purporting to rest on *Hancock* v. *Train*, 426 U. S. 167 (1976). In *Hancock* we determined that, as then written, § 118 of the Clean Air Act, 42 U. S. C. § 1857f (1970 ed.), did not require federal facilities to obtain state pollution permits as a condition of continued operation. The relevant portion of § 1857 required the National Government to "comply with Federal, State, interstate, and local requirements respecting control . . . of air pollution." Ohio and its *amici* stress the point in our analysis where we found it significant that § 1857 did not require federal compliance with "*all* federal, state, interstate, and local

## III

The judgment of the Court of Appeals is reversed, and the cases are remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE WHITE, with whom JUSTICE BLACKMUN and JUSTICE STEVENS join, concurring in part and dissenting in part.

These cases concern a uranium-processing plant which, the Government concedes, has "contaminated the soil, air and surface waters" of Fernald, Ohio, with radioactive materials, "exceeded certain of the effluent limitations set forth" in its water pollution permit, and "failed to construct portions of the water pollution control facilities in accordance" with the permit. Answer ¶¶ 28, 33.

The situation at the Fernald plant is not an aberration. The Department of Energy (DOE) estimates that taxpayers may pay $40 to $70 billion during the next 20 years to clean

---

requirements," or with "*all* requirements of the applicable state implementation plan." See 426 U. S., at 182 (emphasis in original). They read our opinion as drawing a distinction between substantive and procedural requirements, and as interpreting § 1857 as not waiving federal immunity from procedural requirements, the group in which we classified the state permit programs. Ohio and its *amici* conclude that the drafters of RCRA took our observations in *Hancock* to heart, and, seeking to waive federal sovereign immunity for all purposes, including liability for civil punitive fines, waived immunity for "all . . . requirements, both substantive and procedural." 42 U. S. C. § 6961; see Brief for Respondent Ohio 41; see also, e. g., Brief for State of California et al. as *Amici Curiae* 21.

The answer to this is twofold. Indications of the breadth of the Government's obligation to comply with substantive or procedural requirements dealt with in *Hancock* do not necessarily translate into indications that the Government's subjection to mechanisms for enforcing those obligations extends to punitive as well as to coercive sanctions. In any event, if Congress had in fact entertained the intention Ohio suggests, it would hardly have avoided any example of punitive fines at the same time as it expressly mentioned the coercive injunctive remedy.

up or contain the contamination at its facilities.[1]  Federal facilities fail to comply with the Clean Water Act (CWA), 33 U. S. C. § 1251 *et seq.*, twice as frequently as private industry.[2]  And the compliance rate of the Departments of Defense and Energy with the Resource Conservation and Recovery Act of 1976 (RCRA), 42 U. S. C. § 6901 *et seq.*, is 10 to 15 percent lower than that of private industry.[3]

In an effort to compel Government agencies to adhere to the environmental laws under which private industry must operate, Congress waived sovereign immunity for civil penalties in the federal facilities and citizen suit provisions of the CWA, 33 U. S. C. §§ 1323, 1365(a), and in the citizen suit provision of the RCRA, 42 U. S. C. § 6972(a).  Today, the majority thwarts this effort by adopting "an unduly restrictive interpretation" of both statutes and writing the waivers out of existence.  *Canadian Aviator, Ltd.* v. *United States,* 324 U. S. 215, 222 (1945); *Block* v. *North Dakota ex rel. Bd. of Univ. and School Lands,* 461 U. S. 273, 287 (1983).  In so doing, the majority ignores the "unequivocally expressed" intention of Congress, *United States* v. *Nordic Village, Inc., ante,* at 33; *United States* v. *Mitchell,* 445 U. S. 535, 538 (1980), and deprives the States of a powerful weapon in combating federal agencies that persist in despoiling the environment.

I

It is axiomatic that a statute should be read as a whole. 2A N. Singer, Sutherland on Statutory Construction § 46.05 (5th ed. 1992).  When the federal facilities and citizen suit

---

[1] Cleanup at Federal Facilities: Hearing on H. R. 765 before the Subcommittee on Transportation and Hazardous Materials of the House Committee on Energy and Commerce, 101st Cong., 1st Sess., Ser. No. 101–4, p. 44 (1989).

[2] U. S. General Accounting Office, Report to Congressional Requestors: Water Pollution, Stronger Enforcement Needed to Improve Compliance of Federal Facilities 3 (1988).

[3] H. R. Rep. No. 102–111, p. 3 (1991).

provisions of the CWA are so read, the conclusion becomes inescapable that Congress intended to waive sovereign immunity for civil penalties under the statute.

The federal facilities provision, 33 U. S. C. § 1323(a), see *ante*, at 620, both establishes the Government's duty to comply with the substantive and procedural requirements of the CWA and explicitly waives immunity for civil penalties. The first part of the federal facilities provision states that the Federal Government is subject to "any process and sanction," regardless of the court in which it is enforced.

The majority devotes three pages of its opinion to a tortured discussion of whether subjecting the Government to "process and sanction" encompasses liability for civil penalties. See *ante*, at 621–623. Rather than engaging in these analytic gymnastics, the Court needed to do nothing more than read the rest of the federal facilities provision. It clearly states:

> "[T]he United States shall be liable only for those civil penalties arising under Federal law or imposed by a State or local court to enforce an order or the process of such court." 33 U. S. C. § 1323(a).

Obviously, Congress intended the United States to be liable for civil penalties. The plain language of the statute says so. Therefore, the broad term "sanctions" used earlier in the same subsection must include these penalties. Any other reading would contravene the "ancient and sound rule of construction that each word in a statute should, if possible, be given effect." *Crandon* v. *United States,* 494 U. S. 152, 171 (1990) (SCALIA, J., concurring in judgment); *Mountain States Telephone & Telegraph Co.* v. *Pueblo of Santa Ana,* 472 U. S. 237, 249 (1985); *Colautti* v. *Franklin,* 439 U. S. 379, 392 (1979).

The question, then, is not whether Congress has waived federal immunity for civil penalties. The waiver here unambiguously reached those claims for civil penalties "arising

under" federal law. The critical inquiry is under what circumstances civil penalties arise under federal law.

## A

Ohio contends that it is entitled to recover civil penalties on two different claims: the first brought under the CWA itself, through its citizen suit provision, 33 U. S. C. § 1365(a), and the second under the Ohio water pollution laws that arise under the CWA's distinctive mechanism allowing States to administer CWA enforcement within their own boundaries. Ohio Rev. Code Ann. § 6111.09 (Supp. 1987). I agree that the waiver of immunity covers both types of claims.

## 1

First, the CWA waives sovereign immunity for civil penalty claims brought under the Act's citizen suit clause. 33 U. S. C. § 1365(a). See *ante,* at 615–616. That section unambiguously provides authority to sue "any person (including . . . the United States . . .)" and to recover "any appropriate civil penalties" under the civil penalties clause of the CWA enforcement provision, § 1319(d). It is impossible to fathom a clearer statement that the United States may be sued and found liable for civil penalties. The enforcement provision lists those violations that may be subject to a civil penalty, sets a ceiling on the size of the penalty, and lists factors that the court should consider in determining the amount of a penalty. *Ibid.*

Nevertheless, the majority concludes that this straightforward approach is not sufficient to waive immunity. The Court latches onto the fact that the enforcement provision does not include its own definition of "person" and that the CWA's general purpose definition of the word "person" does not include the United States. § 1362(5).[4] Again, there is a

---

[4] Section 1362(5) states: "The term 'person' means an individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a State, or any interstate body."

short answer to this claim. The statute says, in plain English, that its general definitions apply "[e]xcept as otherwise specifically provided." § 1362. The citizen suit provision is one of the exceptions to the general rule; it states that any person, as used in that subdivision, includes the United States. § 1365(a). Certainly this special definition applies to the civil penalty enforcement provisions it incorporates.

To conclude otherwise is to resort to "ingenuity to create ambiguity" that simply does not exist in this statute. *Rothschild* v. *United States*, 179 U. S. 463, 465 (1900).

## 2

The CWA also waives immunity for civil penalties arising under state laws enacted to allow local administration of the CWA permit program. The majority rejects this proposition by relying on cases in which the Court has held that state laws approved by the Federal Government do not "arise under" federal law. See *ante*, at 625–626. But these cases are inapposite because the CWA regime goes far beyond simple federal approval of state action. Instead, the Act establishes a distinctive variety of cooperative federalism.

As we recently explained: "The Clean Water Act anticipates a partnership between the States and the Federal Government . . . ." *Arkansas* v. *Oklahoma, ante*, at 101. To effectuate this partnership, the CWA authorizes the Environmental Protection Agency (EPA) to issue pollution discharge permits, 33 U. S. C. § 1342, but provides that a State may "administer" its own permit system if it complies with detailed statutory and regulatory requirements. 33 U. S. C. § 1342(b); 40 CFR §§ 123.1–123.64 (1991). A State that seeks to "administer" a permitting program is required to adopt a system of civil penalties. 33 U. S. C. § 1342(b)(7). Federal regulations establish the minimum size of the penalties and mandate how, and when, they must be imposed. 40 CFR §§ 123.27(a)(3)(i), 123.27(b)(1), 123.27(c) (1991).

Even when a State obtains approval to administer its permitting system, the Federal Government maintains an extraordinary level of involvement. EPA reviews state water quality standards. 33 U. S. C. § 1313(c). It retains authority to object to the issuance of particular permits, § 1342(d)(2), to monitor the state program for continuing compliance with federal directives, § 1342(c), and even to enforce the terms of state permits when the State has not instituted enforcement proceedings, § 1319(a).

Under this unusual statutory structure, compliance with a state-administered permit is deemed compliance with the CWA. § 1342(k). Indeed, in *EPA* v. *Oklahoma,* decided together with *Arkansas* v. *Oklahoma,* the EPA asserted that "the showing necessary to determine under the CWA whether there is compliance with any particular state [pollution] standard is itself *a matter of federal, not state, law."* Brief for Petitioner, O. T. 1991, No. 90–1266, p. 18, n. 21 (emphasis added). Cf. *Arkansas* v. *Oklahoma, ante,* at 110 (recognizing the "federal character" of state pollution standards in interstate pollution controversy). This conclusion is not surprising, since the citizen suit provision of the CWA authorizes any citizen to sue under federal law for a "violation of . . . an order issued by . . . a State with respect to [any effluent] standard or limitation . . . ." 33 U. S. C. § 1365(a).

Given the structure of the CWA, it is apparent that the "arising under" limitation on the waiver of sovereign immunity was not intended to protect the Federal Government from exposure to penalties under state laws that merely provide for the administration of a CWA permit system. Instead, the limitation shields the Government from liability under state laws that have not been subject to initial EPA review and ongoing agency supervision.[5] Only by resorting

---

[5] States may adopt more rigorous water quality standards than those established under the CWA. EPA regulations provide that a State is not precluded from:

to "an unduly restrictive interpretation" of the CWA and focusing on the "arising under" language in isolation can the majority reach a contrary result. *Canadian Aviator,* 324 U. S., at 222.

## B

Because of its determination to find that civil penalties are not available against the Government, the majority paints itself into a corner. The Court acknowledges that its distortion of the statute leaves the phrase "civil penalties arising under Federal law" devoid of meaning. See *ante,* at 626–627. But rather than reading the CWA as Congress wrote it and recognizing that it effects a waiver of immunity, the majority engages in speculation about why Congress could not have meant what it unambiguously said:

> "Perhaps it used [civil penalties arising under federal law] just in case some later amendment might waive the Government's immunity from punitive sanctions. Perhaps a drafter mistakenly thought that liability for such sanctions had somehow been waived already. Perhaps someone was careless." *Ibid.*

It is one thing to insist on an unequivocal waiver of sovereign immunity. It is quite another "to impute to Congress a desire for incoherence" as a basis for rejecting an explicit waiver. *Keifer & Keifer* v. *Reconstruction Finance Corporation,* 306 U. S. 381, 394 (1939); *Franchise Tax Bd. of California* v. *Postal Service,* 467 U. S. 512, 524 (1984). Cf. *Canadian Aviator, supra,* at 225. That is what the majority does today. "Surely the interest in requiring the Congress

"(1) Adopting or enforcing requirements which are more stringent or more extensive than those required under this part;

"(2) Operating a program with a greater scope of coverage than that required under this part. *If an approved State program has greater scope of coverage than required by Federal law the additional coverage is not part of the Federally approved program.*" 40 CFR § 123.1(h)(i) (1991) (emphasis added).

to draft its legislation with greater clarity or precision does not justify a refusal to make a good-faith effort to ascertain the actual meaning of the message it tried to convey in a statutory provision that is already on the books." *Nordic Village, ante,* at 45 (STEVENS, J., dissenting).

The unambiguous language of the federal facilities and citizen suit provisions of the CWA clearly contemplate a waiver of immunity as to suit for civil damages, and "once Congress has waived sovereign immunity over certain subject matter, the Court should be careful not to 'assume the authority to narrow the waiver that Congress intended.'" *Ardestani* v. *INS,* 502 U. S. 129, 137 (1991), quoting *United States* v. *Kubrick,* 444 U. S. 111, 118 (1979); *Irwin* v. *Department of Veterans Affairs,* 498 U. S. 89, 94 (1990).

## II

Turning to the RCRA, I agree with the majority and with the Court of Appeals that the RCRA federal facilities provision does not effect an unambiguous waiver of immunity from civil penalties, 42 U. S. C. § 6961. See *ante,* at 627–628. The section makes no reference to civil penalties and, instead, waives immunity for "any such injunctive relief." This language comports with the Government's claim that the waiver is intended to reach only coercive and not punitive sanctions. The provision certainly does not unequivocally encompass civil penalties. Therefore, I join Part II–C of the Court's opinion.

However, I would find a waiver under RCRA's citizen suit provision, 42 U. S. C. § 6972(a), see *ante,* at 616, which is very similar to the citizen suit provision in the CWA, for the reasons I have explained above. See Part I–A–1, *supra.*

## III

The job of this Court is to determine what a statute says, not whether it could have been drafted more artfully. In these cases, the federal facilities and citizen suit provisions of

the CWA and the citizen suit provision of the RCRA unambiguously waive the Federal Government's immunity from civil penalties. That is all the law requires.