# EPA Assessment of Penalties Against Federal Agencies for Violation of the Underground Storage Tank Requirements of the Resource Conservation and Recovery Act

The Resource Conservation and Recovery Act authorizes the Environmental Protection Agency to assess penalties against federal agencies for violations of RCRA's underground storage tank provisions. EPA's underground storage tank field citation procedures do not violate RCRA or the Constitution.

June 14, 2000

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
DEPARTMENT OF DEFENSE
AND
THE GENERAL COUNSEL
ENVIRONMENTAL PROTECTION AGENCY

The Department of Defense ("DOD") has asked for our opinion resolving a dispute between it and the Environmental Protection Agency ("EPA") concerning whether the Resource Conservation and Recovery Act of 1976, Pub. L. No. 94–580, § 2, 90 Stat. 2795 ("RCRA") (codified as amended at 42 U.S.C. §§ 6901–6992k (2000)), authorizes EPA to assess penalties against federal agencies for violations of RCRA's underground storage tank ("UST") provisions, 42 U.S.C. §§ 6991–6991i. DOD has also asked whether EPA's procedures for field citation of UST violations comply with statutory and constitutional requirements.[1] We conclude that RCRA clearly grants EPA the authority to assess penalties against federal agencies for UST violations and that EPA's UST field citation procedures do not violate RCRA or the Constitution.

I.

A.

A straightforward reading of RCRA's statutory text and the relevant legislative history leads us to conclude that it was clearly Congress's intent to authorize EPA

---

[1] See Memorandum for Randolph D. Moss, Acting Assistant Attorney General, Office of Legal Counsel, from Judith A Miller, General Counsel, DOD, Re: Constitutional and Statutory Validity of Administrative Assessment of Fines Against Federal Facilities Under Sections 6001, 9001, 9006, and 9007 of the Solid Waste Disposal Act for Alleged Violations Relating to Underground Storage Tanks (Apr. 16, 1999) ("DOD Memorandum"); Memorandum for Randolph Moss from Judith Miller, Re. Constitutional and Statutory Validity of Administrative Assessment of Fines Against Federal Facilities Under Sections 6001, 9001, 9006, and 9007 of the Solid Waste Disposal Act for Alleged Violations Relating to Underground Storage Tanks — ADDITIONAL INFORMATION (June 1, 1999); Memorandum for Randolph Moss from Gary S. Guzy, Acting General Counsel, EPA, Re: Constitutional and Statutory Validity of Administrative Assessment of Penalties Against Federal Facilities under Subtitle I of the Resource Conservation and Recovery Act (RCRA) (July 14, 1999) ("EPA Memorandum").

to assess penalties against federal agencies for violation of the UST requirements. Section 9006(a)(1) of Subtitle I of RCRA, the subtitle regulating underground storage tanks, states that whenever "any person is in violation of any requirement of [Subtitle I]," EPA may issue an administrative order requiring compliance. 42 U.S.C. § 6991e(a)(1). Section 9006(c) of Subtitle I provides that the order "shall . . . assess a penalty, if any, which the Administrator determines is reasonable taking into account the seriousness of the violation and any good faith efforts to comply with the applicable requirements." 42 U.S.C. § 6991e(c).

Section 9006 of Subtitle I thus authorizes EPA to assess penalties against persons who violate UST requirements. Section 9001, the Subtitle I definitions section, provides that "[t]he term 'person' . . . includes . . . the United States Government," 42 U.S.C. § 6991(6), thus strongly supporting the view that section 9006 applies to the United States. We do not need to decide, however, whether sections 9001 and 9006 of Subtitle I, standing alone, provide a sufficiently clear statement of congressional intent with respect to assessments against federal agencies, because that intent is made abundantly clear by section 6001(b) of RCRA, which applies to all subtitles of RCRA and which expressly addresses EPA administrative enforcement actions against federal facilities. Section 6001(b) provides that

> [t]he [EPA] Administrator may commence an administrative enforcement action against any department, agency, or instrumentality of the executive, legislative, or judicial branch of the Federal Government pursuant to the enforcement authorities contained in this [title]. The Administrator shall initiate an administrative enforcement action against such a department, agency, or instrumentality in the same manner and under the same circumstances as an action would be initiated against another person.

42 U.S.C. § 6961(b)(1). In our view, in light of section 9006's authorization of EPA to enforce the UST requirements by assessing penalties, section 6001(b)'s authorization of EPA to bring enforcement actions against federal agencies "pursuant to the enforcement authorities contained in this [title] . . . in the same manner and under the same circumstances as an action would be initiated against another person" is unmistakably clear in authorizing assessment of those penalties against federal agencies.

This conclusion is confirmed by the legislative history of section 6001(b). That provision was added to RCRA by the Federal Facility Compliance Act of 1992 ("FFCA"), which was enacted to "clarify provisions concerning the application of certain requirements and sanctions to Federal facilities." Preamble to the FFCA, Pub. L. No. 102–386, 106 Stat. 1505, 1506 (1992). The Senate Report accompanying the FFCA stated that

> [t]he clarification of this authority is necessary because, in the past, other Federal agencies, including the DOJ, have disputed EPA's authority to issue administrative orders against other Federal agencies. The Reagan Administration sought to invoke the "unitary executive" theory to prevent the EPA from issuing administrative orders against other Federal agencies. . . .
>
> . . . . .
>
> Accordingly, the language contained in the [FFCA] with respect to administrative orders clarifies existing law, so as to provide the EPA with clear administrative enforcement authority sufficient to ensure Federal facility compliance.

S. Rep. No. 102–67, at 5–6 (1991). The House Report contains a similar rationale for the clarification.[2]

Moreover, the legislative history of the FFCA clearly demonstrates that Congress intended to authorize EPA to assess penalties against federal agencies. The Senate Report's section on "Background and Need for the Legislation" cited longstanding "difficulties with Federal facility compliance" and then stated that "[t]he ability to impose fines and penalties for violations of the Nation's environmental statutes is an important enforcement tool. As the EPA testified before the Committee, 'penalties serve as a valuable deterrent to noncompliance and to help focus facility managers' attention on the importance of compliance with environmental requirements.'" *Id.* at 4. The House Report also reflects a legislative intent to authorize the EPA to issue administrative penalty orders against federal agencies: "[I]n issuing a final order or agreeing to a consent order to resolve any violations . . . , the Committee intends that provisions for stipulated penalties be included in the order if that is the normal practice in such orders resolving violations by other persons." H.R. Rep. No. 102–111, at 17.

In sum, we conclude that the plain text of the statute, together with its legislative history, leaves no question as to Congress's intent to authorize EPA to assess

---

[2] The House Report observed that

> [EPA's] broad administrative order and penalty authority was provided by Congress in 1976 to assist the Administrator in resolving violations of [RCRA].
>
> Until challenged by the [Department of Energy] in 1986 at Rocky Flats, Colorado and Hanford, Washington, the EPA program policy for RCRA called for the use of administrative orders to resolve violations by federal agencies. Legally, the General Counsel of EPA has maintained that the authority to issue administrative compliance orders to other federal agencies "is clearly provided under the Act and that our exercise of such authority would not offend any constitutional principles." Letter dated August 1, 1986 from Francis Blake to F. Henry Habicht, Assistant Attorney General. That position is eminently sound.

> By adding subsection (b) to Section 6001, this bill reaffirms the original intent of the act authorizing administrative enforcement actions against federal facilities. It further provides that when the Administrator exercises his discretion to initiate an administrative action against a federal facility, the administrative enforcement action shall be initiated in the same manner and under the same circumstances as an action would be initiated against another person.

H.R. Rep No 102–111, at 16 (1991).

penalties against federal agencies for violation of the UST requirements of RCRA.[3]

## B.

DOD argues against the foregoing conclusion by focusing on the differences in wording between sections 6001(a) and 9007(a) of RCRA. *See generally* DOD Memorandum at 4–9. DOD relies on the fact that section 6001(a), which applies to solid and hazardous wastes but not to the underground storage tanks at issue in this opinion, contains an express statement that penalties may be assessed against federal agencies,[4] while section 9007(a), which applies to underground storage tanks, does not contain such a statement.[5]

DOD observes that the last two sentences of the relevant portion of section 6001(a), *see supra* note 4, which expressly state that federal agencies may be subject to penalties and fines, were added by Congress in 1992 in the FFCA, after the Supreme Court had held in *Department of Energy v. Ohio*, 503 U.S. 607 (1992), that the first sentence, which contains more general language stating only that federal agencies "shall be subject to, and comply with, all Federal, State, interstate, and local requirements," was insufficient to waive the sovereign immunity of the United States against liability to the State of Ohio for penalties and fines. Stressing that section 9007(a), the provision applicable to underground storage tanks, contains only the more general language of the first sentence of section 6001(a) and was not amended by Congress after *DOE v. Ohio*, DOD concludes

---

[3] We do not agree with DOD's position, *see* DOD Memorandum at 3, 17–21, that we must find "an unequivocal expression" of a congressional intent to authorize EPA to assess penalties against federal agencies This Office applies the "unequivocal expression" standard to issues of waiver of sovereign immunity, *see Authority of USDA to Award Monetary Relief for Discrimination*, 18 Op. O.L.C. 52, 54–55 (1994), but where the issue is whether Congress has authorized a federal agency to assess penalties against another federal agency, sovereign immunity is not implicated. Moreover, to the extent some form of a clear statement is required, *see Administrative Assessment of Civil Penalties Against Federal Agencies Under the Clean Air Act*, 21 Op O.L.C. 109, 111–13 (1997) ("Clean Air Act Opinion"), the evidence of congressional intent here is abundantly clear

[4] Section 6001(a) provides, in the part relied upon by DOD, as follows:

    Each department, agency, and instrumentality of the executive, legislative and judicial branches of the Federal Government . . . shall be subject to, and comply with, all Federal, State, interstate, and local requirements . respecting control and abatement of solid waste or hazardous waste disposal and management . . . The Federal, State, interstate, and local . . requirements referred to in this subsection include . all civil and administrative penalties and fines, regardless of whether such penalties or fines are punitive or coercive in nature . . . . The United States hereby expressly waives any immunity otherwise applicable to the United States with respect to any such substantive or procedural requirement (including . . any civil or administrative penalty or fine referred to in the preceding sentence . . .).

42 U S C § 6961(a). *See* DOD Memorandum at 7.

[5] Section 9007(a) provides as follows:

    Each department, agency, and instrumentality of the executive, legislative and judicial branches of the Federal Government having jurisdiction over any underground storage tank shall be subject to and comply with all Federal, State, interstate, and local requirements, applicable to such tank, both substantive and procedural, in the same manner, and to the same extent, as any other person is subject to such requirements, including payment of reasonable service charges Neither the United States, nor any agent, employee, or officer thereof, shall be immune or exempt from any process or sanction of any State or Federal court with respect to the enforcement of any such injunctive relief.

42 U.S.C § 6991f(a)

that "the specific federal facility language of § 9007 does not permit inclusion of punitive fines in administrative orders for alleged UST violations by federal agencies." DOD Memorandum at 3.

DOD's reliance on the difference between sections 6001(a) (waiving sovereign immunity as to solid and hazardous waste claims by non-federal claimants) and 9007(a) (apparently not waiving sovereign immunity as to underground storage tanks claims by non-federal claimants) is misplaced. The federal facility provision of RCRA that governs this opinion is not section 9007(a), but rather section 6001(b). The FFCA's amendment to section 6001(a) and its addition of section 6001(b) served fundamentally different purposes. The former amendment was enacted to provide, in response to *Department of Energy v. Ohio*, an unequivocal expression of congressional intent to waive sovereign immunity against imposition of penalties and fines against federal facilities in response to claims by *non-federal* claimants. In contrast, the addition of the latter provision was to provide a clear statement, in response to "unitary executive" arguments advanced by the Department of Justice, that the *federal* government enforcement agency (EPA) was authorized to bring administrative actions, which include imposition of penalties, against federal facilities. The doctrine of sovereign immunity does not apply to enforcement actions by one federal government entity against another, and thus the pointed language included in section 6001(a) to waive sovereign immunity is inapposite to and was not included in section 6001(b).

The FFCA's legislative history states quite clearly this distinction between the sovereign immunity focus of the amendment to section 6001(a) and the intra-executive branch focus of the addition of section 6001(b). The Senate Report states in the first paragraph of its "Purpose and Summary" section that "[t]he purpose of the [FFCA] is to make the waiver of sovereign immunity contained in section 6001 . . . clear and unambiguous with regard to the imposition of civil and administrative fines and penalties." S. Rep. No. 102–67, at 1. The final paragraph of that introductory section states that "[t]he FFCA *also* provides that the Administrator of the EPA may commence an administrative enforcement action against any Federal department, agency, or instrumentality." *Id.* at 2 (emphasis added). The Senate Report goes on to discuss sections 6001(a) and 6001(b) under separate headings. The former is discussed under the "Waiver of Sovereign Immunity" heading, while the latter is discussed under the "EPA Administrative Order Authority" heading. The section 6001(a) discussion, as the heading indicates, is clearly about waiver of sovereign immunity, a doctrine that concerns the immunity of the federal government against being sued in court, which includes having penalties enforced against it in court,[6] while the section 6001(b) discussion concerns whether, in the non-judicial, intra-executive branch context, one federal agency

---

[6] *See* S Rep. No 102–67, at 4 ("At present, RCRA is the only major Federal environmental statute for which several federal courts of appeal have held that it is ambiguous whether sovereign immunity has been waived with respect to the imposition of fines and penalties. It is necessary to clarify this ambiguity to improve the pace of clean-up of existing contamination from past practices and to deter future violations ").

may administratively impose penalties against another federal agency.[7] The discussion in the House Report is similar in this regard.[8]

In sum, section 6001(b), not section 9007(a), is controlling here. The fact that Congress responded to *Department of Energy v. Ohio* by waiving sovereign immunity for solid and hazardous wastes in section 6001(a), but did not at the same time similarly amend section 9007(a) regarding underground storage tanks, is immaterial to the issue before us. As discussed above, section 6001(b) is the RCRA provision addressing EPA enforcement actions against federal agencies. Section 6001(b) applies to all subtitles of RCRA, including the underground storage tank subtitle, and it clearly incorporates EPA's penalty authority under the UST enforcement provisions in section 9006.

## C.

DOD presents, as a separate argument, the appropriations law position that "in the absence of specific legislative authority, neither appropriated funds of the Department of Defense, nor those of any other Federal agency may lawfully be used for the payment of administrative penalties." DOD Memorandum at 15. *See generally id.* at 15–17. We disagree with this broad statement, but recognize that particular appropriations provisions might limit or preclude payment of an administrative fine. Because the issue of particular appropriations provisions has not been briefed to us, however, we do not reach this more specific inquiry.

In general, there does not need to be specific legislative authority authorizing an agency to pay these penalties other than the specific legislative authority that we have already concluded exists for EPA to assess the penalties. An agency would typically have authority to pay the penalties that have been lawfully assessed against it in the course of its conduct of agency business, pursuant to the "necessary expense" principle of appropriations law. Under that principle,

> a general appropriation may be used to pay any expense that is necessary or incident to the achievement of the underlying objectives for which the appropriation was made. General Accounting Office, *Principles of Federal Appropriations Law* 3–12 to 3–15 (1982). If the agency believes that the expenditure bears a logical relationship to the objectives of the general appropriation, and will make a direct contribution to the agency's mission, the appropriation may be used.

---

[7] As discussed above, *supra* at 86–88, this portion of the Senate Report clearly sets forth the intra-executive branch focus of the addition of section 6001(b).

[8] *Compare* H.R Rep No 102–111, at 5–6 (general discussion); *id* at 6 ("The Committee intends for this legislation to overturn any court decisions which have restricted in any fashion the waiver of sovereign immunity provided in Section 6001."), *with id* at 16–17 (general discussion); *id.* at 16 ("By adding subsection (b) to Section 6001, this bill reaffirms the original intent of the act authorizing administrative enforcement actions against federal facilities ").

*Indemnification of Department of Justice Employees*, 10 Op. O.L.C. 6, 8 (1986). *See also* General Accounting Office, *Principles of Federal Appropriations Law* 4–16 (2d ed. 1991) ("The expenditure must bear a logical relationship to the appropriation sought to be charged. In other words, it must make a direct contribution to carrying out either a specific appropriation or an authorized agency function for which more general appropriations are available."). In our view, the payment of administrative expenses in the course of implementing a statutory program, such as statutorily-authorized administrative penalties assessed by another federal agency, constitutes a cost of doing business and therefore "bears a logical relationship to the objectives of [the assessed agency's] general appropriation, and will make a direct contribution to the agency's mission." 10 Op. O.L.C. at 8.

The bases for our conclusion that RCRA grants EPA the authority to assess penalties against federal agencies for UST violations also support the corollary conclusion that as a general matter statutory authority exists for the penalized federal agencies to use appropriated funds to pay the penalties. Because we conclude that RCRA does authorize EPA to assess penalties against federal agencies, we further conclude, under the "necessary expense" principle, that agency appropriations will, absent a statutory limitation, be available to pay the penalties.[9]

Of course, appropriations authority will turn on the meaning of particular statutory provisions, and in a particular circumstance an appropriations act or other statute might include terms that explicitly or implicitly preclude payment. We do not address in this opinion the possible application of section 8149 of the Department of Defense Appropriations Act for Fiscal Year 2000, which prohibits DOD's use of appropriated funds "for the payment of a fine or penalty that is imposed against the Department of Defense or a military department arising from an environmental violation at a military installation or facility unless the payment of the fine or penalty has been specifically authorized by law." Pub. L. No. 106–79, § 8149, 113 Stat. 1212, 1271 (1999). This provision was enacted into law after DOD and EPA had completed their submissions to us for this opinion, and we have not heard from DOD or EPA regarding their interpretation of this provision. We have also very recently become aware that legislation currently pending in the Senate would add a provision to the U.S. Code that would supersede section 8149 and prohibit such a payment by DOD without specific authorization only if the amount of the fine or penalty is $1.5 million dollars or more or if the

---

[9] In the analogous context of Internal Revenue Service ("IRS") assessments of penalties against federal agencies, the Comptroller General has concluded that, "*[i]n the absence of a statutory provision requiring payment*, the appropriations of [federal] agencies are not available for payment of interest and penalties" to the IRS for the agencies' failure to pay employment taxes for their employees. *Federal Agency Payment of Penalties and Interest on Federal Employment Taxes*, B–161,457, 1978 WL 9910, at *1 (C G May 9, 1978) (emphasis added) The clear implication of the Comptroller General's opinion is that a statutory provision requiring payment would support using agency appropriations to make such payment Although the opinions and legal interpretations of the Comptroller General, a legislative branch official, are not, of course, binding upon departments, agencies, or offices of the executive branch, *see Bowsher v. Synar*, 478 U.S 714, 727–32 (1986), they often provide helpful guidance on appropriations matters and related issues. We find persuasive the cited Comptroller General opinion, as well as the *Principles of Federal Appropriations Law* discussions cited in the text

fine or penalty is based on "the application of economic benefit criteria or size-of-business criteria." National Defense Authorization Act for Fiscal Year 2001, S. 2549, 106th Cong., § 342 (as reported by the Senate Armed Services Committee on May 12, 2000). If DOD or EPA would like us to address questions relating to these or similar provisions, we would be happy to do so after receiving further submissions from DOD and EPA.

## II.

The second question that DOD raises is whether EPA's procedures for field citation of UST violations comply with statutory and constitutional requirements. Under EPA's procedures, an EPA inspector, functioning much like a police officer handing out a traffic ticket, issues field citations directly to violators.[10] As described by EPA:

> EPA uses the field citation program to address many prevalent, clear-cut violations that are relatively easy to correct. Typically, an UST field citation is a one-page document which includes an order pursuant to RCRA § 9006 to address violations listed in RCRA § 9006(d), coupled with an abbreviated settlement agreement. . . . The recipient of the field citation may either settle by accepting the field citation, paying a small penalty and returning to compliance within a certain time frame, or may refuse to accept the citation. EPA automatically withdraws the field citation if the recipient refuses to accept it. EPA would then consider anew whether to issue an administrative order. These orders are governed by the more formal 40 C.F.R. Part 22 hearing procedures. Field citations offer a less resource-intensive approach to bring facilities with minor violations back into compliance than more formal methods of UST enforcement.

EPA Memorandum at 14.

DOD argues that EPA's field citation program does not comply with section 6001(b)(2) of RCRA, which provides that "[n]o administrative order issued to [a federal] department, agency, or instrumentality shall become final until such department, agency, or instrumentality has had the opportunity to confer with the Administrator." 42 U.S.C. § 6961(b)(2). DOD asserts that the statute is violated because the field citation program does not give federal agencies an opportunity to confer with the Administrator.

---

[10] The "traffic ticket" analogy is EPA's own program characterization. EPA's guidance for the UST field citation program states that "[o]ne enforcement option is the use of field citations, 'traffic ticket'-styled citations issued on-site by inspectors, generally carrying a penalty." Office of Solid Waste and Emergency Response Directive 9610 16, *Guidance for Federal Field Citation Enforcement* at 1 (Oct. 1993)

We do not agree that the field citation program violates or is otherwise incon-
sistent with section 6001(b)(2). The statute requires only that an enforcement order
not become final unless there is an opportunity for a recipient federal agency
to confer with the Administrator. The program complies with that requirement.
A field citation becomes final only if the recipient does not contest the citation
and instead consents by signing the citation and agreeing to pay a small penalty.
By consenting, the recipient agency, in effect, waives the opportunity to confer
with the Administrator. Non-consent, in contrast, results in immediate withdrawal
of the citation. In that circumstance, there remains no order at all, much less a
final order. EPA then considers whether to bring another enforcement action, and
recipient agencies may contest any such action and request a conference with the
Administrator. Thus, the statutory right to confer with the Administrator is pre-
served for any situation where there is an actual dispute between EPA and a
recipient agency.

DOD also argues that the field citation procedure precludes the President from
exercising his supervisory authority under Article II of the Constitution. As DOD
sees it:

> [P]resented with a UST field citation, a federal agency must either
> pay the amount imposed by EPA without debate (and thereby
> deprive the Attorney General and the President of any supervisory
> role in the resolution of interagency disputes) or allow the field
> citation to lapse and face the consequences [of] EPA's other
> [enforcement] options. . . . In DoD's experience, the formal pro-
> ceeding can be 'more stringent' than the field citation by a factor
> in excess of 10 times. . . . Thus, an installation commander with
> a meritorious defense (but a shortage of discretionary funds with
> which to pay administrative penalties) might be hard pressed to
> elect the formal route simply to preserve the principle that the Presi-
> dent has a Constitutional right to supervise the executive branch.
> That being the case, the UST field citation process has effectively
> thwarted the Constitutional principle on which the OLC rested its
> [Clean Air Act Opinion].

DOD Memorandum at 13–14.

We do not believe that the field citation procedures raise a separation of powers
issue. The issue discussed in our Clean Air Act Opinion concerned the separation
of powers implications of a possible interpretation of an Act of Congress that
might infringe upon the President's supervisory authority over the executive
branch. No separation of powers issue is raised, however, by the application within
the executive branch of an administrative procedure established by EPA, an
agency of the executive branch. There is no question that the President retains

the authority to supervise the field citation program for UST violations, including the authority to direct the EPA to change the program if he believes doing so would facilitate his supervision.

Moreover, even if EPA's field citation procedures were congressionally mandated and thus potentially gave rise to a separation of powers issue, we believe that constitutional concern would be more apparent than real because the procedures do not interfere with or limit the President's exercise of his constitutional authority to supervise the executive branch. The program affects in a binding way only those cases in which a citation recipient consents; if the recipient contests a citation, it is automatically withdrawn and no dispute remains for the President to resolve. If EPA subsequently brings an enforcement action, all of the normal dispute resolution procedures will be available at that time, including the statutory right to confer with the Administrator. The absence of any restriction on the President's authority to review such a dispute is dispositive of any separation of powers question. *Id.*[11]

DOD's section 6001(b)(2) and Article II arguments boil down to the position that a federal agency recipient of a UST field citation from an EPA inspector is entitled to contest the citation before the Administrator of EPA (under the statutory argument) or the President (under the constitutional argument). Although it is no doubt within the power of the Administrator or the President to adopt such a process for these "traffic tickets," neither the statute nor the Constitution requires the process.

### III.

In summary, we conclude that RCRA clearly grants EPA the authority to assess penalties against federal agencies for UST violations and that EPA's UST field citation procedures do not violate RCRA or the Constitution.

RANDOLPH D. MOSS
*Acting Assistant Attorney General*
*Office of Legal Counsel*

---

[11] Nor do we see a constitutional question presented by the hypothetical scenario where an installation commander agrees to a field citation rather than run the risk of receiving a significantly heavier penalty in a formal proceeding. Procedures such as plea bargaining in order to avoid the risk of a substantially higher penalty, or settling civil claims in order to avoid a potentially much costlier judgment, are quite common and not problematic so long as the plea or settlement is voluntary and not the result of coercion. *Cf. Brady v. United States*, 397 U.S 742, 749–55 (1970) (affirming finding of voluntariness where defendant pleaded guilty rather than risk death penalty). We do not perceive any lack of voluntariness or any coercion inherent in the EPA field citation program