CHEYENNE–ARAPAHO GAMING COMMISSION, an agency of the Cheyenne and Arapaho Tribes of Oklahoma; Eastern Shawnee Gaming Commissioner, an agency of the Eastern Shawnee Tribe of Oklahoma; Fort Sill Apache Gaming Commission, an agency of the Fort Sill Apache Tribe of Oklahoma; Seneca–Cayuga Gaming Commissioner, an agency Seneca–Cauyga Tribes of Oklahoma, Plaintiffs,

v.

NATIONAL INDIAN GAMING COMMISSION; Montie Deer, Chairman of the National Indian Gaming Commission; John Ashcroft, Attorney General of the United States; United States Department of Justice; Scott Woodward, acting United States Attorney for the Northern District of Oklahoma; Robert G. McCampbell, United States Attorney for the Western District of Oklahoma, Defendants.

No. 01–CV–0632–C.

United States District Court,
N.D. Oklahoma.

July 11, 2002.

William D. Wood, Richard J. Wilson, Fulbright & Jaworski, Houston, TX, Richard W. Beckler, Fulbright & Jaworski, Washington, DC, Stephen B. Otto, Stephen B. Otto Law Offices, Newport Beach, CA, Michael Burrage, Dennison, TX, for Plaintiffs.

Phil Pinnell, Catherine J. Depew, United States Attorney, Tulsa, OK, Steven K. Mullins, U.S. Attorney's Office, Oklahoma City, OK, Cynthia S. Omberg, National Indian Gaming Commission, Washington, DC, for Defendants.

## ORDER

H. DALE COOK, Senior District Judge.

Before the Court is the motion to dismiss filed by defendants, National Indian Gaming Commission; Montie Deer, Chairman of the National Indian Gaming Commission; John Ashcroft Attorney General of the United States; United States Department of Justice; Scott Woodward, acting United States Attorney for the Northern District of Oklahoma; Robert G. McCampbell, United States Attorney for the Western District of Oklahoma (collectively referred to as "defendants" or "NIGC"), pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction. Plaintiffs, Cheyenne–Arapaho Gaming Commission, an agency of the Cheyenne and Arapaho Tribes of Oklahoma; Eastern Shawnee Gaming Commissioner, an agency of the Eastern Shawnee Tribe of Oklahoma; Fort Sill Apache Gaming Commission, an agency of the Fort Sill Apache Tribe of Oklahoma; Seneca–Cayuga Gaming Commissioner, an agency Seneca–Cauyga Tribes of Oklahoma, (collectively referred to as "plaintiffs" or "Tribes") have filed a complaint on August 27, 2001, and motion for injunctive relief.

Plaintiffs request two remedies within their motion for preliminary injunction. First, plaintiffs request a declaratory judgment that the "Break the Bank" game should be considered a Class II game and that the devices are, in fact, technological aids to the play. Second, the plaintiffs request a preliminary and permanent injunction prohibiting defendants from interfering with the operation of the Break the Bank game. Defendants requested and received a fourteen-day extension of time in which to file defensive pleadings. Subsequently, on September 25, 2001, defendants filed a motion to dismiss instead of filing an answer to the complaint. Plaintiffs responded to defendants' motion to dismiss on October 15, 2001. On October 30, 2001, Plaintiffs filed a supplemental response to defendants' Motion to Dismiss for Lack of Jurisdiction. On November 5, 2001, defendants replied to plaintiffs' response to motion to dismiss for lack of jurisdiction. After consideration of the briefs, arguments of the parties, and applicable law, the Court finds and concludes as follows:

*Factual Background*

On May 31, 2000, Kevin Washburn, who is the General Counsel of the National Indian Gaming Commission (NIGC), issued a Game Classification opinion letter to President Cyrus Schindler, Seneca Nation of Indians, Salamanca, New York. The NIGC issued this advisory opinion as a result of a field investigator's initial observed play of a gaming device called "Break the Bank" during an inspection of the Seneca Nation in New York in February, 2000. In the Game Classification Opinion Letter, NIGC's General Counsel advised President Schindler that the "Break the Bank," a/k/a "Cadillac Jack PTC Multi–Tab System," and its network of gaming devices was in fact a Class III gaming device. However, the state of

Oklahoma and the plaintiffs (Cheyenne–Arapaho tribe, Eastern Shawnee tribe, Fort Sill Apache tribe, and Seneca–Cayuga tribe) have no Tribal–State compact authorizing the play of Class III gaming machines.

In considering whether the "Break the Bank" game was to be considered a Class II or Class III game under the Indian Gaming Regulatory Act ("IGRA"), the general counsel reviewed a videotape of the game taken by an NIGC investigator at Lucky Star Casino, operated by the Cheyenne and Arapaho Tribes of Oklahoma, where "Break the Bank" was also in play. The NIGC general counsel also examined a detailed description of the game that the game's marketer, Cadillac Jack, Inc., gave the Seneca Nation. The General Counsel of the NIGC concluded that the "Break the Bank" game should be considered a Class III game because it serves as an electronic facsimile of pull-tabs and not a technological aid. However, the NIGC did not threaten enforcement and has not brought an action against plaintiffs based on the letter. Nevertheless, the President of the Seneca Nation in New York, Schindler, notified NIGC that the tribe had ceased the play of "Break the Bank" prior to July 4, 2001, and the manufacturer had removed said devices by July 9, 2001.

*Standard for Motions to Dismiss*

■ There are two ways to present a motion to dismiss for lack of subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1). First, a complaint may simply fail to allege facts upon which subject matter jurisdiction can be based. In that situation, "[I]t must appear beyond doubt that the plaintiff can prove no set of facts that would entitle him to relief. All well-pleaded facts, as distinguished from conclusory allegations, must be taken as true. All reasonable inferences must be indulged in favor of the plaintiff, and the pleadings must be liberally construed." *Swanson v. Bixler,* 750 F.2d 810, 813 (10th Cir.1984) (citations omitted). In effect, the plaintiff is afforded the same procedural protection as would be received in a Rule 12(b)(6) analysis. "Second, a party may go beyond allegations contained in the complaint and challenge the facts upon which subject matter jurisdiction depends." *Holt v. United States,* 46 F.3d 1000, 1002–03 (10th Cir.1995). In addressing a factual attack, the court does not "presume the truthfulness of the complaint's factual allegations," but "has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1)." *Id.* The Court is empowered to dismiss the action when it appears "clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *See Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *Lehman v. City of Louisville,* 967 F.2d 1474, 1476 (10th Cir.1992).

*Applicable Statutory / Regulatory Scheme*

This case is governed by the IGRA which was passed by Congress in 1988, to codify Indian Gaming as an instrument to further tribal self-government and economic development. *See* 25 U.S.C. § 2701 et. seq. The IGRA established a National Indian Gaming Commission ("NIGC") as a component of the Department of Interior to oversee tribal gaming, which is divided into three categories, which are Class I, II, and III. *See* 25 U.S.C. § 2703(6)–(8).

In classifying Indian gaming into three categories, Congress also specified for each category the permissible scope of state regulation versus the NIGC administration. Class I includes "social games solely for prizes of minimal value or traditional forms of Indian gaming." 25 U.S.C. § 2703(6). Class I gaming is to be regu-

lated exclusively by the Indian tribal governments, and thus is not subject to any state regulation. *See* 25 U.S.C. § 7310(a)(4).

Class II gaming includes several variations of bingo and non-banking card games already allowed in the state in which gaming is conducted. This classification of Indian gaming specifically does not encompass "electronic or electromechanical facsimiles of any game of chance or slot machines of any kind." 25 U.S.C. § 2703(7)(B)(ii). While the Indian tribe may regulate Class II games, it is still subject to federal oversight as promulgated by the NIGC, and also must conform to applicable state laws. *See* 25 U.S.C. §§ 2706(b), 2710.

Class III consists of all gaming activities not included in Class I and II. *See* 25 U.S.C. § 2703(8). This category is not regulated by the states, however, the tribes may only conduct Class III gaming pursuant to a Tribal–State compact approved by the Secretary of the Interior. *See* 25 U.S.C. §§ 2710(d), 2703(8). Class III games include casino-type table games, slot machines, lotteries, and parimutuel wagering. *See* 25 U.S.C. § 2703(8). *See generally* 25 C.F.R. § 502 (1995) (regulations promulgated by the NIGC), S.Rep. No. 100–446, 100th Cong., 2d Sess. 5, reprinted in 1988 U.S.C.C.A.N. 3071.

The IGRA contains an enforcement procedure as set forth in 25 U.S.C. § 2713. When the NIGC finds that the tribal operator of gaming is failing to comply with statutory and regulatory guidelines, the chairman issues a Notice of Violation ("NOV") to the tribal operator. The NOV contains a citation to the violated federal requirement, a description of the surrounding circumstances, measures required to correct the violation, a time limit for such correction with a notice of right to appeal to the full Commission. The NOV

and any subsequent civil penalties imposed by the NIGC may be appealed to the full Commission. If the Commission upholds the Chairman's issuance of the NOV, judicial review is available in Federal District Court. *See* 25 U.S.C. § 2714.

The most severe enforcement measure that the NIGC can take is an order for temporary closure. This can be issued simultaneously or subsequent to the issuance of an NOV. The temporary closure order is subject to expedited review and is considered a final agency action available for judicial review no more than sixty days after a tribe appeals. *See* 25 U.S.C. § 2714(b). The closure order or fine may issue if the tribal gaming operation fails to correct violations, fails to pay the required fees, operates a Class III gaming machine without a Tribal–State compact, operates a Class II gaming machine without a license from a tribe in violation of 25 C.F.R. § 558, fails to have proper background investigations or licenses pursuant to 25 C.F.R. § 558.3, or where there is evidence of fraud.

*Discussion*

Before a federal court may review the underlying merits of the claim raised by the claimant, plaintiff must fulfill procedural requirements set by federal law for seeking judicial review. Thus, the Court must determine whether plaintiffs are in the proper forum; and also, whether this Court has jurisdiction over the matter at hand.

In the case at bar, defendants state multiple grounds for dismissal. First, they contend that the complaint should be dismissed under Fed.R.Civ.P. 12(b)(1) because plaintiffs fail to allege any proper jurisdictional basis for maintaining their action against the government, there is no pre-enforcement judicial review pursuant to the applicable statute, and there has not

been a final decision by the NIGC. Defendants are essentially arguing that plaintiffs failed to allege any facts upon which valid subject matter jurisdiction could be found, but have not gone beyond the allegations to challenge the facts upon which jurisdiction depends. Thus, the Court shall presume the truthfulness of the complaint's factual allegations.

In reading the Motion to Dismiss, the Court notes that defendants allege multiple reasons for the dismissal of the case at bar. Their arguments range from constitutional to prudential components of justiciability and matters concerning subject matter jurisdiction. The concept of reviewability, standing, pre-enforcement review of agency action, finality, and administrative exhaustion are closely related doctrines, but are very much distinct from one another and are governed by their own considerations. To fail to isolate and treat each inquiry independently is to risk obscuring what is at issue. Many courts in the past have obscured what is at issue and merged these legal concepts into one inquiry under the general rubric of "standing." *See Association of Data Processing Service Organizations, Inc., et. al. v. Camp,* 397 U.S. 159, 176, 90 S.Ct. 838, 25 L.Ed.2d 192 (1970). Thus, the Court will analyze each doctrine and how it applies to the case at bar in turn.

*Subject Matter Jurisdiction*

■ The threshold question the Court must first address is whether it has subject matter jurisdiction over the case. In so doing, the Court notes that "federal courts are courts of limited jurisdiction, and the party invoking federal jurisdiction bears the burden of proof." *Penteco Corp. Ltd. Partnership—1985A v. Union Gas Sys., Inc.,* 929 F.2d 1519, 1521 (10th Cir.

1991). Plaintiff must allege subject matter jurisdiction either under a federal question, pursuant to 28 U.S.C. § 1331, or through complete diversity, pursuant to 28 U.S.C. § 1332. "A case arises under federal law if its 'well pleaded complaint either establishes that federal law creates a cause of action or that plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law.'" *Morris v. City of Hobart,* 39 F.3d 1105, 1111 (10th Cir.1994) (quoting *Franchise Tax Bd. v. Construction Laborers Vacation Trust,* 463 U.S. 1, 27–8, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983)).

In the case before the Court, plaintiffs argue in their complaint that jurisdiction is invoked by 28 U.S.C. § 1331 because this action arises under the Indian Gaming Regulatory Act ("IGRA"). Title 28 of the United States Code § 1331 vests district courts with original jurisdiction of all civil actions arising under the Constitution, law, or treaties of the United States, jurisdiction. *See* 28 U.S.C. § 1331. Thus, plaintiffs argue that jurisdiction exists in the case at bar because the controversy invites the court's interpretation and application of the IGRA[1] which is a federal statute within the meaning of 28 U.S.C. § 1331.

■ Statutes conferring general jurisdiction, however, do not waive sovereign immunity. *Lonsdale v. United States,* 919 F.2d 1440, 1444 (10th Cir.1990). Section 1331, being a general jurisdiction statute, has never been construed as a waiver of sovereign immunity of the United States from suit. *See id., Cotter Corporation v. Seaborg,* 370 F.2d 686 (10th Cir.1966), *Anderson v. United States,* 229 F.2d 675 (5th Cir.1956). This jurisdictional limitation imposed by Congress cannot be "dis-

---

**1.** *See* 25 U.S.C. § 2714 (IGRA provides for the prosecution of administrative claims with the Indian Gaming Commission and for general judicial review of the Commission's decisions under the Administrative Procedures Act ("APA")).

regarded nor evaded." *Owen Equipment & Erection Co. v. Kroger,* 437 U.S. 365, 374, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978).

Although plaintiffs argue that defendants have taken an opposite position concerning jurisdiction in a case before the Tenth Circuit that originated from the United States District Court for the Northern District of Oklahoma,[2] the Court finds this fact irrelevant. Plaintiffs essentially contend that defendants' differing legal approach in another case precludes them from challenging subject matter jurisdiction in the case at bar. However, jurisdictional arguments made by parties in a separate case have no bearing on the instant case. Thus, defendants cannot be estopped from challenging the exercise of jurisdiction over the current civil action simply due to defendants' acquiescense concerning jurisdiction in a previous legal brief. *See Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 702, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982) (holding parties cannot confer subject matter jurisdiction by consent, estoppel, or waiver); *see also Wilson v. Glenwood Intermountain Properties, Inc.,* 98 F.3d 590, 593 (10th Cir.1996) (parties cannot confer subject matter jurisdiction on the courts by agreement), *Donahue v. Warner Bros. Pictures,* 194 F.2d 6, 10 (10th Cir.1952), *Parks v. Montgomery Ward & Co.,* 198 F.2d 772 (10th Cir.1952) (holding that parties cannot by consent confer upon a court jurisdiction of the subject matter of an action which it would not have possessed without such consent).

Furthermore, jurisdiction is not an issue in the case of *Seneca–Cayuga Tribe of Oklahoma v. National Indian Gaming Commission.*[3] Instead, at issue was whether the Court should grant a preliminary injunction enjoining the federal defendants from bringing enforcement action against the plaintiffs, who had received an advisory opinion from NIGC's General Counsel advising them that they were operating a Class III game. The District Court, Judge Michael Burrage [4] presiding, granted injunctive and declaratory relief for the plaintiffs. The government appealed to the Court of Appeals concerning the District Court's failure to grant the NIGC's advisory opinion some degree of deference.

■ Disregarding plaintiffs' contention that the government's acknowledgment of proper excise of jurisdiction over the civil action in that case should be viewed as consent or inconsistent statements of jurisdiction in this case; or that jurisdiction was not even at issue in that case, challenges to jurisdiction in this case may still be heard. A challenge to the Court's jurisdiction may be raised at any time. *See* Fed.R.Civ.P. 12(h)(3); *Farmers Ins. Co., Inc. v. Hubbard,* 869 F.2d 565, 570 (10th Cir.1989). Thus, not only do defendants' statements in the previously mentioned Tenth Circuit case hold no value, but they can be invalidated by a challenge to subject matter jurisdiction at that level at any time.

*Sovereign Immunity*

■ This is a lawsuit against the United States, agencies, and officers thereof. It is well established and "elementary that '[t]he United States, as sovereign, is

---

**2.** *Seneca–Cayuga Tribe of Oklahoma v. National Indian Gaming Commission,* No. 01–5066 (10th Cir.2001).

**3.** The Court notes that *Seneca–Cayuga Tribe of Oklahoma v. National Indian Gaming Com-* *mission,* No. 01–5006 (10th Cir.2001) is still pending at the Tenth Circuit Court of Appeals.

**4.** The Court notes that Michael Burrage now serves as counsel for the plaintiffs in the case at bar.

immune from suit save as it consents to be sued ..., and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit.' " *United States v. Mitchell*, 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980) (*quoting United States v. Sherwood*, 312 U.S. 584, 61 S.Ct. 767, 85 L.Ed. 1058 (1941)). The doctrine of sovereign immunity operates to preclude lawsuits against the United States, its agencies, and its employees acting in their official capacity. *See FDIC v. Meyer*, 510 U.S. 471, 475, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994); *Block v. North Dakota*, 461 U.S. 273, 280, 103 S.Ct. 1811, 75 L.Ed.2d 840 (1983). Sovereign immunity is a jurisdictional bar to such actions unless the United States waives immunity and consents to suit. *See Meyer*, 510 U.S. at 475, 114 S.Ct. 996; *Loeffler v. Frank*, 486 U.S. 549, 554, 108 S.Ct. 1965, 100 L.Ed.2d 549 (1988); *United States v. Murdock Mach. & Eng'g Co.*, 81 F.3d 922, 929 (10th Cir.1996). "Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *Meyer*, 510 U.S. at 475, 114 S.Ct. 996 (*citing Loeffler*, 486 U.S. at 554, 108 S.Ct. 1965); *see Murdock Mach.*, 81 F.3d at 930 (*quoting Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 704, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949)) ("Thus, if the government has not consented to suit, the courts have no jurisdiction to either 'restrain the government from acting, or to compel it to act.' ").

■■■■■ "The terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *United States v. Testan*, 424 U.S. 392, 399, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). Waivers by the government of sovereign immunity are to be read narrowly. *See Schmidt v. King*, 913 F.2d 837, 839 (10th Cir.1990). Because immunity is assumed until proven otherwise, the plaintiff bears the burden of proving that the sovereign has waived its immunity and that the Court has the jurisdictional right to hear the case. *See McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 188, 56 S.Ct. 780, 80 L.Ed. 1135 (1936). Jurisdictional questions are of primary consideration and can be raised at any time by courts on their own motion. *See McGrath v. Kristensen*, 340 U.S. 162, 71 S.Ct. 224, 95 L.Ed. 173 (1950); *First State Bank v. Sand Springs State Bank*, 528 F.2d 350 (10th Cir.1976). Accordingly, questions of sovereign immunity may be raised at any time in the proceedings of a case. *See Daigle v. Shell Oil Co.*, 972 F.2d 1527, 1539 (10th Cir. 1992), *Hicks*, 928 F.2d at 970, *Farmers Ins. Co. v. Hubbard*, 869 F.2d 565, 570 (10th Cir.1989).

The principle of sovereign immunity "has been deeply embedded in our federal system from its inception." *Welch v. Texas Dep't of Highways & Pub. Transp.*, 483 U.S. 468, 107 S.Ct. 2941, 97 L.Ed.2d 389 (1987). The rule receives its genesis from the doctrine that government should not be hindered in its performance of activities essential to the governing of the nation, unless through its own consent. *See Larson*, 337 U.S. at 704, 69 S.Ct. 1457, *Kawananakoa v. Polyblank*, 205 U.S. 349, 353, 27 S.Ct. 526, 51 L.Ed. 834 (1907). Thus, a court may not exercise subject matter jurisdiction over a claim against the federal government except as Congress allows. *See United States v. Orleans*, 425 U.S. 807, 814, 96 S.Ct. 1971, 48 L.Ed.2d 390 (1976). The existence of congressional consent is a prerequisite for jurisdiction. *See United States v. Mitchell*, 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983); *Sherwood*, 312 U.S. at 586, 61 S.Ct. 767. "Congress has broad powers over the jurisdiction of the federal courts and over the sovereign immunity of the United States...." *California v. Arizona*, 440 U.S. 59, 99 S.Ct. 919, 59 L.Ed.2d 144

(1979). When the United States consents to be sued, the terms of the waiver of sovereign immunity define the contours of a court's jurisdiction to entertain such a suit. *See Meyer,* 510 U.S. at 475, 114 S.Ct. 996; *United States v. Mottaz,* 476 U.S. 834, 841, 106 S.Ct. 2224, 90 L.Ed.2d 841 (1986); *Mitchell,* 445 U.S. at 538, 100 S.Ct. 1349; *United States v. Testan,* 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976).

■■■■ A waiver of sovereign immunity must be strictly construed in favor of the sovereign and not enlarged beyond that which the statute requires. *See United States Dep't of Energy v. Ohio,* 503 U.S. 607, 615, 112 S.Ct. 1627, 118 L.Ed.2d 255 (1992); *Fostvedt v. United States,* 978 F.2d 1201, 1202 (10th Cir.1992). Therefore, a waiver of sovereign immunity cannot be implied but instead the intention to waive the United States' sovereign immunity must be unequivocally expressed in statutory text by Congress. *See United States v. Nordic Vill., Inc.,* 503 U.S. 30, 33, 37, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992); *Irwin v. Dept. of Veterans Affairs,* 498 U.S. 89, 95, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990), *Sierra Club v. Lujan,* 972 F.2d 312, 314 (10th Cir.1992). The explicit expression of waiver cannot be inferred through legislative history, but instead the extent of the waiver must be spelled out. *See Nordic Vill.,* 503 U.S. at 37, 112 S.Ct. 1011, *see also Department of the Army v. FLRA,* 56 F.3d 273, 277 (D.C.Cir.1995). Furthermore, when Congress attaches conditions to a waiver of sovereign immunity, "those conditions must be strictly observed, and exceptions thereto are not to be lightly implied." *Block,* 461 U.S. at 287, 103 S.Ct. 1811. Similarly, when a court is confronted with a purported waiver of immunity, the court must construe any ambiguities in favor of immunity. *See United States v. Williams,* 514 U.S. 527, 115 S.Ct. 1611, 131 L.Ed.2d 608 (1995).

*Declaratory Judgment Act and Johnson Act*

■■■■ Plaintiffs assert that the Declaratory Judgment Act (DJA) and the Johnson Act confer jurisdiction on this Court to resolve the claims. Neither the DJA nor the Johnson Act provide an independent basis for this Court's jurisdiction. The DJA is a procedural statute that enlarged federal judicial remedies, but it did not extend federal jurisdiction. Thus, under the DJA, an independent source of jurisdiction is needed to grant relief. *See Skelly Oil Co. v. Phillips Petroleum Co.,* 339 U.S. 667, 671, 70 S.Ct. 876, 94 L.Ed. 1194 (1950).

Additionally, plaintiffs contend that the classification decision implicates the Johnson Act. The Johnson Act provides that it shall be "unlawful to ... use any gambling device ... within Indian Country." 15 U.S.C. § 1175 (1994). The IGRA provides that the Johnson Act does "not apply to any gaming conducted under a Tribal–State compact that ... is in effect." 25 U.S.C. § 2710(d)(6). Furthermore, the Johnson Act does not prohibit within Indian country the use of a game that is considered to be a Class II game found in the IGRA, but instead only applies to Class III games. *See* 57 Fed.Reg. 12, 382 & 12, 385, 25 U.S.C.A. § 2703(7)(A)(i). However, the Johnson Act does not provide for agency review by the NIGC, thus the agency advisory opinion letter cannot provide for judicial review. To do so would divest the Attorney General of his legal prerogatives and deny the executive branch of any legal action. *See Shoshone–Bannock Tribes v. Reno,* 56 F.3d 1476, 1480 (D.C.Cir.1995).

*Standing*

■■■■ NIGC asserts that plaintiffs lack standing to bring their claim under the IGRA and thus the complaint should

be dismissed for lack of subject matter jurisdiction. *See* Fed.R.Civ.P. 12(b)(1). Standing is a threshold issue and jurisdictional prerequisite for maintaining a case in a federal forum. *See United States v. McVeigh*, 106 F.3d 325, 334 (10th Cir. 1997). To establish standing under Article III of the Constitution, plaintiffs must meet three requirements. First, [plaintiffs] must demonstrate that they have "suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal quotations and citations omitted). Second, plaintiffs must establish causation—"a causal connection" between the injury and the defendant's conduct. *Id.* Third, "[they] must demonstrate redressability—it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* "The party invoking federal jurisdiction bears the burden of establishing these elements." *Id.* at 561, 112 S.Ct. 2130.

▪ They must, in addition to constitutional standing, satisfy the APA's requirement that persons "adversely affected or aggrieved by agency action within the meaning of a relevant statute" may bring suit to challenge a final agency action. 5 U.S.C. § 702. Accordingly, the plaintiff must have prudential standing under § 702 which is established by bringing a cause of action "arguably within the zone of interests to be protected or regulated by the statute in question." *National Credit Union Admin. v. First Nat'l Bank and Trust Co.*, 522 U.S. 479, 488, 118 S.Ct. 927, 140 L.Ed.2d 1 (1998), *see Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 893, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990), *Western Shoshone Bus. Council v. Babbitt*, 1 F.3d 1052, 1055 (10th Cir.1993).

▪ In this case, the Court finds that "injury in fact" does not exist. The agency advisory opinion letter does not rise to the level of actual or imminent harm. The Court notes that the agency advisory opinion letter was addressed to and serves as correspondence to the President of the Seneca Nation of New York, Schindler, and not to the plaintiff tribes.[5] President Schindler may have, in response to a "powerful coercive effect" of the advisory opinion, taken action by voluntarily ceasing play and removing the "Break the Bank" devices. There is no question that by removing the devices from the Indian gaming facilities there will be a drop in net revenue and affect the Seneca nation's primary source of governmental income. However, the Seneca Nation is not a plaintiff in this action and the game classification advisory opinion was no more than an individualized administrative opinion as to how the Seneca Nation employed their devices which is subject to modification or change. The plaintiff tribes in question have taken no affirmative action in regard to the advisory opinion letter by eliminating the gaming device in question.

▪ Plaintiffs argue that although no actual injury has resulted in the advisory opinion letter being issued to the President of the Seneca Nation, when a plaintiff seeks declaratory and injunctive relief, "injury in fact" is established if the plaintiff is likely to suffer future injury. *Cone Corp. v. Fla. Dept. of Transp.*, 921 F.2d 1190, 1203 (11th Cir.1991). Although enforcement action by the NIGC would likely

---

5. Prudential concerns for standing necessitate that a person assert his own rights and interests; thus, one may not bring an action on behalf of a third party's rights or interests. *See Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

result in future injury to the tribes, advisory game classification opinions are not enforcement actions and thus cause no present or future injury. "Once events have transpired on which immediate legal consequences rest, however, such as the passage of a rule requiring immediate compliance," then injury in fact is established. *American Greyhound Racing, Inc. v. Hull,* 146 F.Supp.2d 1012, 1032 (D.Ariz. 2001). As there is no "injury in fact" related to the instant case, further analysis in regard to causal connections, redressability, and prudential considerations are unnecessary.

 Additionally, the question whether the instant cause of action is appropriate for judicial resolution, in other words ripe, clearly "bears close affinity" to questions of standing. *Warth v. Seldin,* 422 U.S. at 499, 95 S.Ct. 2197. The essence of the ripeness doctrine is a question of timing. *See Regional Rail Reorganization Act Cases,* 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974). Whether a case is ripe for judicial review is determined through a two step process. The Court must first "determine whether the issues tendered are appropriate for judicial resolution," and second must, "assess the hardship to the parties if judicial relief is denied at that stage." *Toilet Goods Association v. Gardner,* 387 U.S. 158, 162, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967).

 As previously discussed, this Court finds that the agency advisory opinion letter is not found to be a final decision and thus no injury in fact has occurred. No judicial review would be appropriate until the agency has taken a final determinative action. Furthermore, the Court finds no hardship will occur to the plaintiffs by denying judicial relief at this state, as the plaintiffs have not even had a chance to exhaust their administrative remedies because no NOV has been issued. The removal of the devices cannot be considered a hardship as the decision was voluntarily made by the Seneca Nation and has no effect on the plaintiffs, who are third-parties.

*Waiver of Sovereign Immunity*

 Plaintiffs further contend that the government's sovereign immunity is waived by Section 702 of the APA and attempt to invoke jurisdiction under Title 5 of the United States Code, Section 702, and the general federal question statute, 28 U.S.C. § 1331. However, the APA does not create an independent basis of jurisdiction. *See Califano v. Sanders,* 430 U.S. 99, 105–07, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). Additionally, § 1331 cannot be used as a basis for jurisdiction over a suit against the United States; because, although it grants general jurisdiction, § 1331 does not waive the government's sovereign immunity. *Fostvedt v. U.S.,* 978 F.2d at 1203, *Lonsdale v. U.S.,* 919 F.2d 1440, 1443–44 (10th Cir.1990).

According to the APA, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. Although the APA provides the general right to judicial review of agency actions, it also limits it by establishing when such review is available. The APA contains a broad waiver to government sovereign immunity in agency review actions seeking declaratory and injunctive relief. However, courts would not be able to hear the case until the agency has reached a final decision and taken action in accordance therewith.

Before the Court can determine whether the NIGC General Counsel's advisory opinion letter rises to the level of a final agency action, it must first consider whether such correspondence is an agency action

at all. Since the early 1990's, the NIGC's Office of General Counsel has issued written advisory opinions, such as the one in question, regarding the classification of games and machines under the IGRA. Plaintiffs argue that the advisory opinion letter sent by the NIGC to the Seneca Nation and posted on the NIGC's web-site serves as a definitive statement by the NIGC and Department of Justice ("DOJ"), by nature of the fact that it does not specifically state that it is not representative of the views of the NIGC and DOJ, as others have. However, the Court does not find plaintiffs' argument tenable.

The Court finds more probative the fact that the letter was not signed by the NIGC's chairman as all decisions are, but instead was issued under the name of the General Counsel. For the NIGC to take any official action, the Chairman or the Commission itself, on appeal, must make a decision. *See* 25 U.S.C. §. 2711, et. seq. The General Counsel is simply a staff member of the NIGC advising the decision-makers and tribal entities when required. In this case, the Court finds that the advisory letter is simply courtesy correspondence offering the kind of guidance that is intended to prevent the need for official NIGC action.

The Court notes that the Tenth Circuit has previously regarded opinion letters as "informal pronouncements"[6] which are non-binding agency interpretations, *See United States v. 162 Megamania Gambling Devices*, 231 F.3d 713, 719 (10th Cir. 2000). However, the Court finds that the Circuit's reference to informal pronouncements has more to do with describing the advisory capacity of the agency and less with characterizing official action of the NIGC. Not all conduct or communications of an agency can be considered action by the agency. "The spectrum of communication ranges from obvious agency action, such as adjudications and regulation, to informal pronouncements, such as opinion letters." *Sabella v. United States*, 863 F.Supp. 1 (D.D.C.1994). However, disregarding the fact that the Court has serious questions whether an advisory opinion letter in this case rises to the level of an agency action at all, it certainly does not amount to a "final" agency action. *See also Sabella*, 863 F.Supp. at 5 ("[t]hough the General Counsel can probably provide a highly educated guess as to the decisions an agency will make, she is not a decision-maker at the highest level and, therefore, her opinion does not create any law or bind the Administrator").

■■■■ For a decision to be considered a final administrative reviewable action, the plaintiff must show that the decision and subsequent agency action was final, not "preliminary, procedural, or intermediate." *Pentax Corp. v. Myhra*, 181 F.R.D. 458, 461 (D.Mont.1994). "In order to determine if an agency action is final, [the Court must] look to whether its impact is direct and immediate; whether the action marks the consummation of the agency's decisionmaking process; and whether the action is one by which rights or obligations have been determined, or from which legal consequences will flow." *Colorado Farm Bureau Federation v. United States Forest Service*, 220 F.3d 1171, 1173 (10th Cir. 2000) (internal quotations omitted). Thus, only if a government agency takes definitive action, after the exhaustion of administrative action, which could end up in legal repercussions, can § 702 waive the sovereign immunity of the United States, even though a legal wrong may have occurred. *See* 5 U.S.C. § 704.

6. *See* Merriam–Webster's Collegiate Dictionary 934 (10th Ed.1999) (defining pronouncement as a formal declaration of opinion or an authoritative announcement).

Because the APA must be read as a whole, *see Ellsworth Bottling Co. v. United States,* 408 F.Supp. 280, 285 (W.D.Okla. 1975), it is clear that § 704 and § 702 are interrelated and must be read together. Section § 702 creates the judicial right of review and § 704 explains when it may be exercised. *See id.* Thus, a person or entity "may be adversely affected by agency action within the meaning of a relevant statute but not entitled to judicial review of that action unless it is made reviewable by statute or unless there is no other adequate remedy in a court." *Id.* at 285, *see also United Tribe of Shawnee Indians v. U.S.,* 253 F.3d 543, 549 (10th Cir.2001). Because only final agency actions fall under § 702's general waiver of sovereign immunity, the question that this Court must consider is whether an agency advisory opinion regarding game classification in relation to the IGRA is a final agency action.

The Court finds that the advisory opinion letter is not considered a final agency action. The letter is simply correspondence from the NIGC's general counsel addressed to the Seneca Nation of Indians in Salamanca, New York, a nonparty in this suit. This advisory opinion represents a comprehensive analysis of the "Break the Bank" game according to the manufacture's literature and as played in the Lucky Star Casino operated by the Cheyenne and Arapaho Tribes of Oklahoma.

The Court finds that the NIGC, according to the IGRA, does not hold out opinion letters from the General Counsel as final agency action. The IGRA specifically delineates the responsibilities of the NIGC as to how they must inform a tribe of a potential conflict with the statute. When the Commission has reason to believe a tribe might be in violation of the IGRA, it must "provide such tribal operator or management contractor with a written com-plaint stating the acts or omissions which form the basis for such belief and the action or choice of action being considered by the Commission." 25 U.S.C. § 2713. The advisory letter in this case does not initiate or threaten enforcement and serves as simply compliance advice that the NIGC gives to tribes who seek to participate in Indian gaming.

The Court notes that Congress's central purpose in enacting IGRA was "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments." § 2702(1). Congress found that "Indian tribes have the exclusive right to regulate gaming activity on Indian lands if the gaming activity is not specifically prohibited by Federal law and is conducted within a State which does not ... prohibit such gaming activity." *See* § 2701(5).

Advisory opinions by their very nature provide guidance to tribes to assist them in regulating their gambling. Because enforcement against a tribe for failure to conform with the IGRA does not depend upon whether there exists an NIGC issued advisory opinion on game classification is evidence that an advisory opinion should be considered simply guidance. To consider them final agency actions would be to muzzle the agency from serving in an advisory role with those that they inherently serve as a government entity. *See National Automatic Laundry and Cleaning Council v. Shultz,* 443 F.2d 689, 699 (D.C.Cir.1971) (stating that "[t]o permit suits for declaratory judgment upon mere informal, advisory, administrative opinions might well discourage the practice of giving such opinions, with a net loss of far greater proportions to the average citizen than any possible gain which would accrue"). Other courts have held that interpretive letters sent by the Chief Counsel

of agencies was not final agency action because the letter was not a definitive statement of policy nor did it have the status of law requiring specific action be taken by the recipient. *See e.g. Air California v. United States Dept. of Transp.,* 654 F.2d 616, 619–20 (9th Cir.1981). The Court holds that this agency opinion letter is not found to have the status of law or a final decision by the agency because the plaintiffs do not risk serious civil penalties for not complying with the guidance. Such civil penalties would occur after an NOV has been issued and the subsequent appeals were denied.

Although the Commission has proposed a rule that would establish a formal process for the classification of games played on Indian lands under the IGRA, this rule has not been adopted. Under that proposed rule, the Commission would decide whether a game was Class II before it would authorize the play of such game in a Class II gaming operation. *See* 64 Fed. Reg. 61234. Within that particular context, an advisory opinion from the Commission's General Counsel office might be very well considered to rise to a level of a de facto final agency decision. In that sense, a notice of violation, as described by § 2713, would serve as a citation by the NIGC for violating their decision as to a particular game, whereas currently it serves simply to inform the tribe that the Commission has *"reason to believe* that the tribal operator of an Indian game is engaged in activities ... that may result in the imposition of a fine, the permanent

closure of a game, or the modification or termination of any management contract."[7] 25 U.S.C. § 2713 (emphasis added). Under the current regulations, a tribe may appeal an NOV to the full Commission, and if the NIGC affirms the NOV, the tribe may then have judicial review, having exhausted their administrative remedies. Thus, the advisory opinion letter issued by the NIGC cannot be considered a final agency action, but serves as an intermediate step in the administrative process.

*IGRA Reviewability*

"Standing doctrine and reviewability doctrine raise identical issues about the nature of the judicial role in the context of statutory review of executive action." *American Society of Travel Agents, Inc. v. Blumenthal,* 566 F.2d 145, 163 (D.C.Cir. 1977). Within the IGRA, Congress specifically addressed what actions by the Commission were reviewable. In Section 15, of Public Law 100–497, the Indian Gaming Regulatory Act, Congress created a comprehensive enforcement and administrative-review scheme. *See* 25 U.S.C. § 2714. Section 2714, of Title 25 of the United States Code states that "[d]ecisions by the Commission pursuant to Sections 2710, 2711, 2712, and 2713 of this title shall be final agency decisions for the purposes of appeal to the appropriate Federal district court pursuant to chapter 7 of Title 5." Thus, the final agency actions enumerated by the IGRA are decisions on tribal gaming ordinances, management contracts, and reviews of existing ordinances, con-

---

**7.** 25 C.F.R. § 573.3 (Notice of Violation) states:

(a) The Chairman may issue a notice of violation to any person for violations of any provision of the Act or this chapter, or of any tribal ordinance or resolution approved by the Chairman under part 522 or 523 of this chapter. (b) A notice of violation shall contain: (1) A citation to the federal or

tribal requirement that has been or is being violated; (2) A description of the circumstances surrounding the violation, set forth in common and concise language; (3) Measures required to correct the violation; (4) A reasonable time for correction, if the respondent cannot take measures to correct the violation immediately; and (5) Notice of rights of appeal.

tract, and civil penalties. *See* 25 U.S.C. § 2710, 2712, 2713, 2714. By Congress specifically stating in § 2714 that the previously mentioned sections represent final agency actions, the implied corollary is that other agency actions are not final, and ergo, not reviewable.

 However, the analysis does not stop at that point. As the Supreme Court has repeatedly acknowledged, there is a "strong presumption that Congress intends judicial review of [final] administrative action." *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 670, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986); *see also Dunlop v. Bachowski*, 421 U.S. 560, 567, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975). "Judicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967).

 This presumption favoring judicial review has been reaffirmed over many years by Congress, however, it is rebuttable upon a showing of "clear and convincing evidence of a contrary legislative intent." *See (Abbott Laboratories v. Gardner*, 387 U.S. 136, 140, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)), *see generally Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 670–73, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986) (discussing the presumption in favor of judicial review). The clear and convincing evidence of "congressional intent to preclude judicial review is present when it is "fairly discernable" in the detail of the legislative scheme." *Block v. Community Nutrition Inst.*, 467 U.S. 340, 351, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984). The Court must determine the Congressional intent to preclude judicial review from the statute's "language, structure, and purpose, and its legislative histo-

ry, and whether the claims can be afforded meaningful review." *Thunder Basin*, 510 U.S. at 207, 114 S.Ct. 771 (citations omitted). As an example, in *Thunder Basin*, the Supreme Court found Congressional intent to preclude judicial review in a "comprehensive enforcement structure, combined with the legislative history's clear concern with channeling and streamlining the enforcement process." *Thunder Basin*, 510 U.S. at 216, 114 S.Ct. 771.

A proper analysis of the IGRA illustrates Congress's intent to provide only limited review under the Act. In considering the IGRA, the Senate stated that Section 15 of the Act provides "that certain Commission decisions will be final agency provisions for purposes of court review." Senate Report 100–446 at 20, 1998 U.S.C.C.A.N. 3071, 3090. Thus, it is clear that Congress intended that a final order be a prerequisite for judicial review since the only reference to judicial review mandate that there must be a decision by the Commission pursuant to only certain sections of the IGRA for it to be considered a final action. *See Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 208, 114 S.Ct. 771, 127 L.Ed.2d 29 (1994) (holding that Congress shows its intent to preclude judicial review where it creates a scheme permitting judicial review only for certain actions).

The omission of a provision thereby shows Congressional intent to prohibit judicial review over any other agency actions as opposed to the few already granted express jurisdiction. Additionally, further evidence of preclusion can be found in § 2714. That section explicitly states that the decisions capable of judicial review are "[d]ecisions made by the Commission." See 28 U.S.C. § 2714. Because Chairman issued orders must be reviewed by the full Commission upon appeal before it is considered a final agency action, the IGRA

then does not consider these orders "decisions" that warrant a forum in federal district courts. Thus, an advisory opinion letter from the NIGC's General Counsel office does not rise to the level of a decision from the Commission.[8]

■ The Court reads the IGRA to permit review only over the permitted sections annotated by § 2714, acknowledges that the structure and scheme show an intent to limit review, and recognizes that the statute delineates certain appeal processes. The Court finds that the IGRA then is not a source of jurisdiction in this case because it provides no expression of waiver in matters arising from an advisory opinion. Even if one were implied or ambiguously expressed, it would be interpreted by the Court in favor of the government. Accordingly, because plaintiffs are not seeking a review of a final action taken under one of those enumerated sections, the complaint shall be dismissed.

*Conclusion*

The Court holds that it does not have, and plaintiffs have not shown there to be,[9] subject matter jurisdiction for the case at bar. Contrary to plaintiffs' arguments, neither the APA nor the IGRA waive governmental sovereign immunity under the facts in this case. There is no judicial review under the APA because the challenged conduct does not meet the statutory requirements of both finality and agency action. Furthermore, the Court holds that Congress has limited the review in the IGRA to final agency actions and the agency advisory opinion letter does not rise to

the level of a final decision. Finally, the Court finds there to be no standing for plaintiffs due to the fact that no injury in fact has occurred.

Thus, it is the Order of the Court that defendant's motion to dismiss filed on September 25, 2001, is GRANTED. All other pending motions are deemed MOOT.

---

**8.** The Court notes that the structure of the IGRA indicates that Congress intended, as they did with the Mine Act that a party wishing to challenge an agency determination risk a penalty before being entitled to judicial review.

**9.** *See Warth v. Seldin,* 422 U.S. 490, 518, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) ("It is the responsibility of the complainant clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers").