# United States Court of Appeals

## For the First Circuit

No. 17-1166

CONSERVATION LAW FOUNDATION, INC.,

Plaintiff, Appellant,

v.

SCOTT PRUITT, Administrator of the United States Environmental
Protection Agency; DEBORAH SZARO, in her capacity as Acting
Regional Administrator, United States Environmental Protection
Agency, Region 1,

Defendants, Appellees.

No. 17-1354

CONSERVATION LAW FOUNDATION, INC.;
CHARLES RIVER WATERSHED ASSOCIATION, INC.,

Plaintiffs, Appellants,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, Scott Pruitt,
Administrator; U.S. ENVIRONMENTAL PROTECTION AGENCY, REGION I,
Deborah Szaro, Acting Regional Administrator,

Defendants, Appellees.

APPEALS FROM THE UNITED STATES DISTRICT COURTS
FOR THE DISTRICT OF RHODE ISLAND AND
THE DISTRICT OF MASSACHUSETTS

[Hon. Mary M. Lisi, U.S. District Judge]
[Hon. Richard G. Stearns, U.S. District Judge]

Before

Torruella, Lipez, and Kayatta,
Circuit Judges.

―――――――

Christopher Kilian, with whom John Maxwell Greene and Conservation Law Foundation were on brief, for appellants.
David Gunter, Environment and Natural Resources Division, U.S. Department of Justice, with whom Jeffrey H. Wood, Acting Assistant Attorney General, and Eric Grant, Deputy Assistant Attorney General, were on brief, for appellees.

―――――――

January 24, 2018

―――――――

**KAYATTA**, <u>Circuit Judge</u>.  In this consolidated appeal, Conservation Law Foundation ("CLF") and Charles River Watershed Association ("CRWA") (collectively "plaintiffs") challenge the dismissal of their claims against the Environmental Protection Agency.  Plaintiffs' two suits focus on 40 C.F.R. § 124.52(b), a regulation promulgated under the Clean Water Act.  This regulation calls for the EPA to send a written notice to a discharger of storm water whenever the EPA "decides that an individual permit is required" for the discharge.  The notice informs the discharger of the EPA's decision and the reasons for it, and includes a permit application.  The principal question before us is whether the EPA's role in developing and approving several so-called TMDLs in Massachusetts and Rhode Island constituted a decision that required the EPA to send section 124.52(b) notices.  For the following reasons, we find that it did not and we therefore affirm the dismissal of both suits.

### I.

### A.

The purpose of the Clean Water Act is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  To accomplish this goal, the Act and its implementing regulations establish various tools aimed at bringing waters of the United States into compliance with regulatory standards.  Three such tools are relevant to this case:

(1) the Act's permitting scheme, specifically its storm water permitting requirements; (2) the development and approval of total maximum daily loads ("TMDLs"); and (3) what is commonly called the Act's citizen-suit provision.

**1.**

The basic requirement of the Act's permitting system is that all discharges from a "point source," defined as "any discernible, confined and discrete conveyance," 33 U.S.C. § 1362(14), must obtain a permit. 33 U.S.C. § 1342(a). This permitting program is called the National Pollutant Discharge Elimination System ("NPDES"). See generally 33 U.S.C. § 1342. Certain states, such as Rhode Island, have been authorized by the EPA to administer their own state-level versions of the permitting system. See 33 U.S.C. § 1342(b).

In 1987, Congress amended the Act to address the problem of polluted storm water. The amendment established that two types of storm water discharges, not relevant here, require NPDES permits. 33 U.S.C. § 1342(p). In addition, Congress authorized the EPA to determine that certain other storm water discharges also require permits. 33 U.S.C. § 1342(p)(2)(E). This additional power is known as the EPA's "residual designation authority."[1] See

_____

[1] Congress's initial grant of residual designation authority applied during the implementation period of the storm water permitting rules. During that period, storm water permits were generally not required unless an exception applied; one such

- 4 -

Envtl. Def. Ctr., Inc. v. EPA, 344 F.3d 832, 873–78 (9th Cir. 2003). Through regulation, the EPA has clarified that authority as follows:

> On and after October 1, 1994, for discharges composed entirely of storm water, that are not [otherwise required] to obtain a permit, operators shall be required to obtain a NPDES permit only if:
> . . .
> (C) The Director, or in States with approved NPDES programs either the Director or the EPA Regional Administrator, determines that storm water controls are needed for the discharge based on wasteload allocations that are part of "total maximum daily loads" (TMDLs) that address the pollutant(s) of concern; or
> (D) The Director, or in States with approved NPDES programs either the Director or the EPA Regional Administrator, determines that the discharge, or category of discharges within a geographic area, contributes to a violation of a water quality standard or is a significant contributor of pollutants to waters of the United States.

40 C.F.R. § 122.26(a)(9)(i)(C)–(D). Additional regulations implementing the permitting requirements provide:

> (a) Various sections of part 122, subpart B allow the Director to determine, on a case-by-case basis, that certain . . . storm water

exception was the exercise of residual designation authority. 33 U.S.C. § 1342(p)(2)(E). Pursuant to a statutory directive, the EPA subsequently promulgated implementing regulations that preserved the agency's residual designation authority. 40 C.F.R. § 122.26(a)(9)(i)(C)–(D); see also NPDES -- Regulations for Revision of the Water Pollution Control Program Addressing Storm Water Discharges, 64 Fed. Reg. 68,722, 68,781 (Dec. 8, 1999) ("The NPDES permitting authority's existing designation authority . . . [is] being retained."). These regulations are the basis for plaintiffs' suits.

discharges (§ 122.26) . . . that do not generally require an individual permit may be required to obtain an individual permit because of their contributions to water pollution.

(b) Whenever the Regional Administrator decides that an individual permit is required under this section, except as provided in paragraph (c) of this section, the Regional Administrator shall notify the discharger in writing of that decision and the reasons for it, and shall send an application form with the notice. The discharger must apply for a permit under § 122.21 within 60 days of notice, unless permission for a later date is granted by the Regional Administrator. The question whether the designation was proper will remain open for consideration during the public comment period under § 124.11 and in any subsequent hearing.

40 C.F.R. § 124.52(a)-(b).

**2.**

In a separate section of the Act, Congress set forth the second regulatory tool relevant to this case. States are required to establish water quality standards and to identify waters that fail to meet those standards. 33 U.S.C. §§ 1313(a), 1313(d)(1)(A)-(B). In order to bring impaired waters into compliance, states are further directed to develop "total maximum daily loads," which represent the maximum amount of a particular pollutant that can be released into a waterway while still maintaining water quality standards. 33 U.S.C. § 1313(d)(1)(C). TMDLs are further subdivided into wasteload allocations and load allocations. 40 C.F.R. § 130.2(i). A wasteload allocation is "[t]he portion of a

receiving water's loading capacity that is allocated to one of its existing or future point sources of pollution." 40 C.F.R. § 130.2(h). A load allocation is "[t]he portion of a receiving water's loading capacity that is attributed either to one of its existing or future nonpoint sources of pollution or to natural background sources." 40 C.F.R. § 130.2(g). The sum of all wasteload allocations and load allocations for a particular water make up the TMDL, see 40 C.F.R. § 130.2(i), which when completed is submitted to the EPA for approval. See 33 U.S.C. § 1313(d)(2).

**3.**

In order to increase the likelihood that these and other requirements are implemented and enforced, the Act contains a citizen-suit provision that provides, in relevant part:

> [A]ny citizen may commence a civil action on his own behalf --
> . . .
> (2) against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator.

33 U.S.C. § 1365(a).

As set forth more fully below, plaintiffs' suits attempt to pull together these three components of the Clean Water Act -- the EPA's residual designation authority for storm water permitting, the development and approval of TMDLs, and the citizen-suit provision -- to force the EPA to require certain third-party

- 7 -

storm water dischargers in Rhode Island and Massachusetts to secure NPDES permits.

## B.

We turn now to the facts and procedural history leading to this appeal. From 2005 to 2011, the Rhode Island Department of Environmental Management developed a number of TMDLs at issue in this case, including TMDLs for Mashapaug Pond and portions of the Sakonnet River. In 2007, the Massachusetts Department of Environmental Protection ("MassDEP") developed two TMDLs for the Charles River and in 2011, developed a third TMDL for the river. The EPA approved all of these TMDLs, finding that they met the requirements of the Act and its implementing regulations. Most of the TMDLs were approved by the end of 2007, with two approved in 2011.

Years later, in April 2015, CLF sued the EPA in the District of Rhode Island. CLF, along with CRWA, also sued the EPA in the District of Massachusetts ten months later. Both suits sought a court order requiring the EPA to notify commercial and industrial dischargers of storm water within the watersheds covered by the TMDLs that they must obtain discharge permits.[2] The

---

[2] Plaintiffs' complaint in the district of Massachusetts also requested the same notice for high-density residential dischargers. Plaintiffs have maintained on appeal that the EPA's duty extends to high-density residential sources, but presumably only within the Charles River watershed, since there was no mention of these dischargers in the Rhode Island case.

two district courts determined, for slightly different reasons, that the EPA's challenged conduct (not sending written notices to storm water dischargers) did not constitute a "failure . . . to perform any act or duty . . . which is not discretionary." 33 U.S.C. § 1365(a)(2). The courts thus found that the suits had no toehold in the Act's limited authorization of citizen suits against the EPA, which is otherwise immune as an agency of the sovereign. They therefore dismissed the cases for want of jurisdiction. See Conservation Law Found., Inc. v. EPA, 223 F. Supp. 3d 124, 129–34 (D. Mass. 2017); Conservation Law Found. v. EPA, No. 15-165-ML, 2016 WL 7217628, at *9 (D.R.I. Dec. 13, 2016). Plaintiffs appealed and their suits were consolidated for review in this court.

## II.

To decide whether these suits against the federal government may proceed under the citizen-suit provision of the Act, we need determine whether plaintiffs have "alleged a failure of the Administrator" to perform a nondiscretionary duty. 33 U.S.C. § 1365(a)(2). Because section 1365(a)(2) is a waiver of sovereign immunity, see U.S. Dep't of Energy v. Ohio, 503 U.S. 607, 615 (1992), it is to be "construed strictly" in favor of the EPA, id. at 615 (quoting McMahon v. United States, 342 U.S. 25, 27 (1951)); see also Massachusetts v. U.S. Veterans Admin., 541 F.2d 119, 123 (1st Cir. 1976). Our standard of review, in turn, is de novo. See Esso Standard Oil Co. (Puerto Rico) v. Rodríguez-Pérez,

455 F.3d 1, 4 (1st Cir. 2006); <u>Paul Revere Life Ins. Co.</u> v. <u>Bromberg</u>, 382 F.3d 33, 34 (1st Cir. 2004).

Plaintiffs' position can be summarized in three steps. According to plaintiffs, the EPA -- in helping to develop and in approving the TMDLs at issue -- made a determination that "storm water controls are needed" for discharges identified in the TMDLs, <u>see</u> 40 C.F.R. § 122.26(a)(9)(i)(C), and/or that "the [storm water] discharge[] or category of discharges" identified in the TMDLs "contributes to a violation of a water quality standard," <u>see</u> 40 C.F.R. § 122.26(a)(9)(i)(D). This determination, say plaintiffs, triggered a duty by the EPA to "notify the discharger in writing" of its decision that the discharger is required to obtain a permit and to "send an application form with the notice." 40 C.F.R. § 124.52(b). Finally, plaintiffs contend that the EPA's duty to notify storm water dischargers is nondiscretionary and therefore is properly the subject of a Clean Water Act citizen suit.

The EPA responds with an array of arguments. It contends that duties established by EPA regulations rather than statutory mandates may not be enforced in a citizen suit; that a duty without a deadline is not mandatory; and that its approval of the TMDLs is not a decision that an individual permit is required within the meaning of 40 C.F.R. § 124.52(b).[3] Because we find this last

_____

[3] The EPA focuses primarily in its briefing, as it did in oral argument, on 33 U.S.C. § 1342(p), the statutory provision

argument to be persuasive, we need not consider the EPA's other arguments.

Our reasoning begins with the TMDLs themselves. TMDLs are developed by state agencies and are incorporated into the state's planning process for overall water quality. See 33 U.S.C. §§ 1313(d)(2), (e)(1). Plaintiffs fairly claim that the EPA sometimes gets involved in the TMDL development process (prior to the approval stage) and, indeed, that the EPA did so here with respect to some of the TMDLs at issue. But plaintiffs offer no reasoned basis for concluding that any such involvement expands the scope of the express determination the EPA makes in approving a TMDL. And that express determination is limited to confirming that the TMDLs "meet the requirements of § 303(d) of the Clean Water Act (CWA), and of EPA's implementing regulations."

More tellingly, even were one to construe the EPA's involvement in preparing and then approving a TMDL as an adoption by the EPA of the "findings" contained in the TMDL, those findings do not identify specific dischargers from whom individual permits are required. The TMDL approval documents contained in the record illustrate this point. Each approval follows a repetitive structure whereby the EPA recites a particular statutory or

governing residual designation authority. However, plaintiffs' claims rely on the applicable regulations, which the EPA also addresses, albeit briefly. We therefore focus on the regulations.

- 11 -

regulatory requirement for the TMDL, summarizes the state's research related to that requirement, and includes a brief "assessment" of the state's analysis. The Lower Charles River TMDL approval illustrates the length and level of specificity of the EPA's assessments. Regarding the requirement that the TMDL include wasteload allocations "which identify the portion of the loading capacity allocated to existing and future point sources," the EPA observed that "MassDEP has determined there is currently insufficient information and detail available to confidently apportion the total phosphorous loading to individual sources." It also noted that there was insufficient data "to separate out the parcels that generate storm water that are not subject to NPDES permits." In its related assessment, the EPA concluded that "it [was] acceptable to group all NPDES eligible storm water discharges into aggregate wasteload allocations" and that "it [was] also acceptable to include both discharges subject to NPDES as well as nonpoint source runoff in th[e] aggregate wasteload category." Certainly this language -- which sanctions not only the aggregation of all storm water point sources within the wasteload allocation but also their inclusion along with sources that are entirely unregulated under the Act -- falls short of qualifying as a determination that any particular discharges must be permitted, either because storm water controls are needed for the discharges, see 40 C.F.R. § 122.26(a)(9)(i)(C), or because they contribute to

- 12 -

a violation of water quality standards, see 40 C.F.R. § 122.26(a)(9)(i)(D).

Indeed, the gap between the TMDL approvals in this case and a determination that a storm water discharger requires a permit appears even wider when we consider precisely what plaintiffs seek. Plaintiffs ask us to conclude that the EPA must send notice and application forms to specific, "identified" dischargers, even though the TMDLs do not identify who those dischargers are. To varying degrees of specificity, the TMDLs in the record describe the geographic area from which storm water discharges originate and the types of enterprises (e.g., commercial, industrial, residential, etc.) that generate those discharges. Importantly, though, the TMDLs do not identify by name or address any individual dischargers, nor do they attempt to designate which specific properties within the studied areas actually discharge storm water. In practical terms, they do not differentiate, for example, an organic farm with a cistern from a large house with a long, impervious driveway. Plaintiffs nevertheless ask us to rule that the EPA must send a written notice under section 124.52(b) to every landowner and business in the area covered by each TMDL.[4]

_____

[4] Plaintiffs formally limit their request to industrial, commercial, and certain residential dischargers. But, as plaintiffs' counsel conceded at oral argument, the logic of their argument extends to every property owner in a given watershed.

At oral argument, plaintiffs offered two reasons why the lack of specificity in the TMDLs is not fatal to their argument. First, section 122.26(a)(9)(i)(D) allows the EPA to determine that a "category of discharges within a geographic area[] contributes to a violation of a water quality standard," and, plaintiffs argue, the TMDLs at the very least do that. Second, even assuming that the EPA must identify particular dischargers, it can easily do so here based on information already within its possession. All the EPA needs to do, plaintiffs seem to suggest, is take one of the maps provided in the TMDLs and collate it with other data to determine the names and addresses of the landowners and businesses in the watershed.

These arguments do not get the horseshoe close to the stake. Although section 122.26 refers to categories of dischargers, section 124.52 (the provision containing the duty plaintiffs seek to enforce) makes clear that it is triggered by a determination made on a "case-by-case basis." 40 C.F.R. § 124.52(a). Simply put, there is nothing in the TMDLs themselves -- and hence nothing in the EPA's approval of the TMDLs -- that even suggests an undertaking to make individualized determinations. Rather, the TMDLs address discharges at the abstract level of source type. A TMDL could certainly provide information that would make a decision to require individual permits quite easy; this appears to be what is contemplated by the

- 14 -

statement in section 122.26 that a determination that storm water controls are needed can be "based on" wasteload allocations in TMDLs. See 40 C.F.R. § 122.26(a)(9)(i)(C). But that is simply not the same as saying that the approval of the TMDL must be deemed to be such a decision.

Moreover, the duty plaintiffs are asking us to enforce is triggered only when the EPA decides that an individual permit is required. 40 C.F.R. § 124.52(b). Even if the TMDLs (and their approvals) did constitute a determination that storm water controls are needed or that storm water discharges are contributing to a water quality standard violation, thus satisfying section 122.26, all that determination requires is that the "operator[] . . . obtain a NPDES permit." 40 C.F.R. § 122.26(a)(9)(i).[5] This could take the form of either a general permit (covering multiple dischargers), see 40 C.F.R. § 122.28(a), or an individual permit -- but only the latter would trigger section 124.52. See 40 C.F.R. § 124.52(b) (requiring notice "[w]henever the Regional Administrator decides that an individual permit is required") (emphasis added). Plaintiffs contend that because the EPA has not adopted general permits for the discharges at issue in this case, "the only means for the sources of these discharges to obtain a permit is to apply for individual permits."

---

[5] At no point have plaintiffs identified the supposed "operators."

- 15 -

But plaintiffs do not explain why the EPA could not choose, even at this stage, to require general permits, as they have for various municipal storm sewer systems in Rhode Island and Massachusetts. This alone is fatal to plaintiffs' position because if the EPA could require a general permit as opposed to an individual one, then one cannot conclude that it has a nondiscretionary duty to inform dischargers that they must secure the latter.

Practical consequences and past practice in this highly regulated arena also counsel against treating the approval of TMDLs as drive-by permitting determinations by the EPA. As noted, plaintiffs' argument, functionally, would require the EPA to notify all property owners in a watershed covered by a TMDL that they must secure a permit because of their contribution to polluted storm water. This mandate would seem to extend not only to every storm water-related TMDL that the EPA approves moving forward, but also to all such TMDLs already approved. The EPA estimates that it has approved or established more than 70,000 TMDLs since the passage of the Clean Water Act, many of which involve storm water discharges. Under plaintiffs' view of the case, in 1990, by enacting the regulations cited in this opinion, the EPA committed itself to notifying a very large number of companies and persons (perhaps as many as tens of millions) as it approved TMDLs covering storm water discharges across the country. Yet the record contains no suggestion whatsoever that either the EPA or the states or the

regulated entities -- or plaintiffs for that matter -- viewed the storm water regulations as having such a far-reaching ramification.  Cf. Michigan v. EPA, 135 S. Ct. 2699, 2708 (2015) (weighing the EPA's "established administrative practice" in determining the reasonableness of the agency's interpretation of the Clean Air Act); Util. Air Regulatory Grp. v. EPA, 134 S. Ct. 2427, 2448 (2014) (emphasizing that "[w]e are not talking about extending EPA jurisdiction over millions of previously unregulated entities").

The EPA has historically engaged in a practice of issuing residual designations in response to citizen petitions, as it did for Long Creek in Maine.  See United States Envtl. Protection Agency, Preliminary Residual Designation Pursuant to Clean Water Act Region I 1, https://www.epa.gov/sites/production/files/2015-11/documents/longcreekrd.pdf; see also 40 C.F.R. § 122.26(f) ("Any person may petition the Director to require a NPDES permit for a discharge which is composed entirely of storm water which contributes to a violation of a water quality standard or is a significant contributor of pollutants to waters of the United States.").  These designations are formal documents containing independent analyses by the EPA and, unlike the TMDL approval documents, identify with particularity the dischargers or categories thereof that are required to secure permits.  See United States Envtl. Protection Agency, Preliminary Residual Designation

Pursuant to Clean Water Act Region I 1, https://www.epa.gov/sites/production/files/2015-11/documents/longcreekrd.pdf. This practice aligns with EPA's position here that section 122.26 requires a "separate, express determination" by the agency. Plaintiffs have provided no reason why they could not, pursuant to regulation, petition the EPA for such a designation. Instead, they ask us to find that in approving state-developed TMDLs, the EPA has implicitly done what it normally does through an entirely different process. It has been said that Congress does not hide elephants in mouseholes. See Whitman v. American Trucking Ass'ns, 531 U.S. 457, 468 (2001). Here, we think it even less likely that the EPA hid a herd of elephants in a mousehole, much less a herd that remained unnoticed for several decades.

Ultimately, we need not conclude that the EPA's reading of its own regulations is the best reading. Rather, we follow that reading so long as it is not "plainly erroneous or inconsistent with the regulation[s]." Auer v. Robbins, 519 U.S. 452, 461 (1997) (quoting Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 359 (1989)). And the fact that the EPA's reading accords with its longstanding practice is yet another reason to apply such a modicum of deference. See Decker v. Nw. Envtl. Def. Ctr., 568 U.S. 597, 614 (2013) ("There is another reason to accord Auer deference to the EPA's interpretation: there

is no indication that its current view is a change from prior practice or a post hoc justification in response to litigation."). For the foregoing reasons, we see no good reason to overbear that deference.  We therefore conclude that the EPA's approval of the TMDLs was not a decision that an individual permit was required, that it therefore did not trigger the notice requirement, and that, consequently, the complaints allege no failure by the EPA to perform a nondiscretionary duty.

### III.

For the foregoing reasons, we <u>affirm</u> the dismissal of both cases comprising this consolidated appeal.